Revised August 7, 1998

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

No. 97-11218

---

METRO FORD TRUCK SALES, INC.,

Plaintiff-Appellant-Appellee,

versus

FORD MOTOR COMPANY,

Defendant Counter-Defendant/Third-Party
Plaintiff-Appellee/Appellant,

DUANE KUPPER, ERIC MAGNUS,
MIKE STECKLER,

Defendants-Appellants,

versus

DANIEL H. FOLEY,

Counter Claimant/Third-Party Defendant-Appellee.

---

Appeal from the United States District Court
For the Northern District of Texas

---

June 26, 1998

Before POLITZ, Chief Judge, REYNALDO G. GARZA and DENNIS, Circuit Judges.

POLITZ, Chief Judge:

Metro Ford Truck Sales, Inc. appeals an adverse summary judgment on its

federal antitrust claims.[1]  Ford Motor Company, Eric Magnus, Mike Steckler, and Duane Kupper appeal the remand of their third-party claim against Daniel H. Foley, Jr. under the Racketeer Influenced and Corrupt Organizations Act.[2]  For the reasons assigned, we affirm.

## BACKGROUND

Ford is engaged in the manufacture of various types of vehicles, including heavy, medium, and light duty trucks.  At all pertinent times, Metro was a motor vehicle dealership licensed to sell and service Ford trucks, and Foley was the dealer-principal.  The relationship between Ford and Metro was governed by Ford Truck and Ford Heavy Duty Truck Sales and Service Agreements.

The focus of this action is a pricing program implemented by Ford, known as Competitive Price Assistance.  This program was used to reduce the wholesale price of a truck to authorized Ford medium and heavy duty truck dealers.  During the 1990-94 period at issue, all Ford medium and heavy truck dealerships were eligible to receive, on every truck, a base level of CPA called "Sales Advantage."  Sales Advantage CPA was obtained by calling Ford's CPA Hotline, and giving the operator basic information about the sale, including the customer's name, the

---

[1] Sherman Act, 15 U.S.C. § 1, and Robinson-Patman Act, 15 U.S.C. § 13(a).

[2] 18 U.S.C. §§ 1961-1968.

2

vehicle specifications, and the vehicle options.

In situations where the sales advantage CPA was insufficient, further procedures permitted a dealer to request additional price reductions, known as "Appeal CPA." The appeal process was initiated when a dealer submitted a CPA appeal form by facsimile to Ford's CPA Central. To justify the need for an Appeal CPA, a dealer had to provide information about the competitive situation surrounding the particular transaction at stake. Ford then evaluated the appeal, along with any additional information it had about the customer, to ensure that all Ford dealers bidding the same customer received an equal CPA, and that all Ford dealers could meet the competition from other original equipment manufacturers. Ford thereafter advised the dealer about the amount of additional CPA, if any, that would be allowed.

Specialized CPA also existed for large volume purchasers. This CPA usually was at a predetermined amount and could be obtained simply by calling the CPA Hotline and providing the customer's name and commitment number. Because these customers attracted so much competition, and ordered such a large volume of trucks, the amount of CPA was made readily available, alleviating the need for the dealer to demonstrate individually a competitive situation or to initiate a CPA appeal.

In response to complaints by another dealer that Metro was obtaining more CPA on bids to the same customer, Ford conducted an audit of certain sales Metro made using the CPA program. Ford concluded that Metro had been applying for CPA in the name of one customer, while actually selling the trucks to someone else; thus receiving more CPA than that to which it was entitled. Metro conceded that it sometimes misrepresented customers when claiming CPA, but alleged that Ford representatives instructed it to claim CPA in the name of its large volume purchasers when the situation warranted CPA beyond Sales Advantage CPA. Ford employees, not surprisingly, denied that Metro was so instructed or that they had knowledge of Metro's practice prior to the audit. Accordingly, Ford determined to charge back the amount of CPA obtained by Metro on the misrepresented transactions, and to pursue termination of Metro's franchise agreements.

To prevent the threatened charge back or terminations, Metro filed the instant action in state court, seeking injunctive relief and asserting various state law claims against Ford and Ford employees Kupper, Magnus, and Steckler (hereinafter collectively referred to as "Ford"). Ford filed counterclaims against Metro and a third-party petition against Foley, alleging several causes of action under state law. Thereafter Metro filed an amended petition, which included a claim against Ford for price discrimination under the Texas Antitrust Act, and Foley filed a

4

counterclaim against Ford for intentional infliction of emotional distress.

Ford removed the action to federal court on the basis that the Texas Antitrust Act does not prohibit price discrimination and, therefore, Metro's antitrust claim for price discrimination could arise, if at all, only under the federal Robinson-Patman Act, conferring federal question jurisdiction. The district court agreed with the basis for removal and denied Metro's motion to remand. Metro thereafter amended its complaint to assert specific claims for price discrimination under § 2(a) of the Robinson-Patman Act and for vertical price fixing under § 1 of the Sherman Act, and Ford amended its third-party complaint against Foley to include a RICO claim.

All parties subsequently moved for summary judgment. The district court granted Ford's motion for summary judgment on Metro's federal antitrust claims. Finding that state law predominated and a substantial overlap existed, the district court remanded the remaining state law claims, as well as the third-party RICO claim, to state court. Both Metro and Ford timely appealed.

**ANALYSIS**

Metro contends that the district court erred in (1) denying leave to designate experts and file expert reports beyond the scheduling order deadline; and (2) granting summary judgment in favor of Ford on its Sherman Act and Robinson-

5

Patman Act claims. In its cross-appeal, Ford contends that the district court erred in remanding its third-party RICO claim, as well as the pendent state law claims.

Metro's first argument on appeal is that the district court erred in denying its motion for leave to designate experts and file expert reports out-of-time, or to recognize its supplemental disclosures. We review a trial court's decision to exclude expert witnesses as a means of enforcing a pretrial order under the abuse of discretion standard.[3] In so doing, we consider: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice."[4]

As a preliminary matter, we note that it is only the ruling on one expert, Dr. Keith Leffler, that is at issue. Absent from Metro's trial motion and its argument on appeal, is sufficient justification for the late designation of this expert witness. Metro essentially complains that Ford failed to provide supplemental discovery. Although this case had been pending for well over two years, and the scheduling order deadlines had been extended previously, Metro did not timely raise this issue in the trial court.

---

[3] **Geiserman v. MacDonald**, 893 F.2d 787 (5th Cir. 1990).

[4] **Id.** at 791.

Nonetheless, Metro contends that the mere one week delay in designating this expert was nominal and resulted in no prejudice, mandating the grant of its motion. Metro fails, however, to note the lack of an accompanying written report, as required by the scheduling order and Rule 26(a)(2)(B), which results, necessarily, in the conclusion that the expert designation deadline was not merely one week late as it contends. Instead, Metro urges this court to recognize the filing of Dr. Leffler's report as timely under the supplemental disclosure deadline some three months later. We decline to do so. The purpose of supplementary disclosures is just that -- to supplement. Such disclosures are not intended to provide an extension of the expert designation and report production deadline.[5] We therefore hold that the district court did not abuse its discretion in refusing to modify the scheduling order and in enforcing the time deadlines.[6]

In its remaining arguments on appeal, Metro contends that the district court erred in granting summary judgment in favor of Ford on its federal antitrust claims.

---

[5] **Sierra Club v. Cedar Point Oil Co.**, 73 F.3d 546 (5th Cir. 1996).

[6] We note that Metro appears to be urging this issue only in anticipation of reversal of the grant of summary judgment. Metro argued below that the need for experts could not be determined until after the district court ruled on the pending summary judgment motions. Because Metro is not claiming that this issue impacted its summary judgment positions, and in light of our decision affirming the grant of same, *infra*, we perceive no prejudice to Metro as to this claim. **See Liquid Drill, Inc. v. U.S. Turnkey Exploration, Inc.**, 48 F.3d 927 (5th Cir. 1995).

We review a grant of summary judgment *de novo*.[7] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[8]

Metro contends that Ford's CPA program constitutes vertical price fixing in violation of the Sherman Act. The district court found the lack of evidence of an agreement fatal to Metro's Sherman Act claim. Metro contends that the district court erred in this regard because the existence of a contract or agreement is not required for a vertical price fixing claim. Metro maintains that Ford's independent and unilateral actions are sufficient to support its claim. We do not find these contentions persuasive.

Section 1 of the Sherman Act expressly requires that there be a "contract, combination ... or conspiracy" between the manufacturer and other distributors in

---

[7] **Martin v. Memorial Hosp. at Gulfport**, 130 F.3d 1143 (5th Cir. 1997).

[8] **Fed. R. Civ. P.** 56(c).

order to establish a violation.[9] "Independent action is not proscribed."[10] Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of a combination or agreement.[11] Thus, the distinction between independent action and joint action is fundamental in antitrust jurisprudence, and a claim will not exist in the absence of the latter.[12] Accordingly, we find and

---

[9] 15 U.S.C. § 1. Purely unilateral behavior is illegal under § 2 of the Sherman Act, but only when it threatens actual monopolization. Metro does not allege or offer evidence of monopolization; instead claiming restraint of trade, which is governed by section 1.

[10] **Monsanto Co. v. Spray-Rite Service Corp.**, 465 U.S. 752, 760 (1984).

[11] **Id.**

[12] **See id.**; **United States v. Colgate & Co.**, 250 U.S. 300 (1919); **Business Electronics Corp. v. Sharp Electronics Corp.**, 485 U.S. 717 (1988).

Metro contends nevertheless that Ford's unilateral actions are *per se* illegal without evidence of a contract under **Dr. Miles Medical Company v. John D. Park & Sons Company**, 220 U.S. 373 (1911). The flaw in Metro's reasoning is its failure to recognize the existence, and corresponding significance, of the systems of contracts involved in that case. The plaintiff, Dr. Miles Medical Company, had devised a system of contracts with its customers to maintain minimum resale prices at which its proprietary medicine products would be sold. The defendant, John D. Park & Sons, was a wholesale drug company which refused to enter into such a contract. The plaintiff charged that the defendant, "in combination and conspiracy with a number of wholesale and retail dealers in drugs and proprietary medicines," procured its medicines by inducing the violation of the contracts. **Id.** at 381-82.

The plaintiff's right to relief depended on the validity of the restrictive contracts, making it the central issue before the Court. The Court found, however, that the contracts constituted unlawful resale price maintenance by restricting "the freedom of trade on the part of dealers who own what they sell." This finding that resale price maintenance is *per se* illegal under § 1 has been reaffirmed by the Court. **See United**

conclude that the district court was correct in determining that the lack of a "contract, combination ... or conspiracy" precludes Metro's Sherman Act claim.

Metro also contends that Ford's implementation of the CPA program resulted in price discrimination in violation of the Robinson-Patman Act. The district court found that Metro failed to demonstrate that the same level of CPA was not functionally available to all dealers and, thus, no evidence of price discrimination exists. Metro insists that summary judgment on this basis was erroneous because whether or not the discounts were equal, no such defense exists unless the discounts were cost justified or offered in good faith to meet competition. Again, Metro's contentions are not persuasive.

Section 2(a) of the Robinson-Patman Act provides that it is unlawful for a seller "either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality."[13] For its claim under § 2(a) of the Robinson-Patman Act to succeed, Metro must adduce evidence of an actual

---

**States v. Parke, Davis & Co.**, 362 U.S. 29 (1960); **California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.**, 445 U.S. 97 (1980); **Monsanto Co.**, 465 U.S. 752. In **Business Electronics Corporation**, however, the Court made it clear that vertical price restraints require an agreement or concerted action, and not just an effect on resale prices, to be *per se* unlawful. 485 U.S. 717. We thus focus on whether the restraint is unilateral or concerted for all aspects of a section 1 claim.

[13] 15 U.S.C. § 13(a).

instance of price discrimination, i.e. a difference in price charged to different purchasers or customers of the discriminating seller for products of like grade or quality.[14] If the challenged lower price was in fact -- and not merely theoretically -- made available to the allegedly disfavored purchasers, the seller cannot be held liable under section 2(a).[15]

This "functional availability" theory "is a judicial graft on § 2(a) and is not explicitly embodied in the text of the statute."[16] Nevertheless, the theory is clear and coincides with the purpose of the Act in that a price discount equally available to all purchasers for the same customer and product is not price discrimination.[17] As found by the district court, the record reflects that Metro was treated the same as all other Ford dealers with respect to CPA for the same customer, and products of like grade and quality. The record further establishes that the CPA program

---

[14] **FTC v. Anheuser-Busch, Inc.**, 363 U.S. 536 (1960).

[15] **See, e.g., FTC v. Morton Salt**, 334 U.S. 37 (1948); **Capital Ford Truck Sales, Inc. v. Ford Motor Co.**, 819 F.Supp. 1555 (N.D. Ga. 1992).

[16] **Precision Printing Co. v. Unisource Worldwide, Inc.**, 993 F.Supp. 338, 350 (W.D. Pa. 1998).

[17] **See Morton Salt**, 334 U.S. 37. While some functional discounts may be covered by the cost justification defense or the meeting competition defense, these defenses present no bar to the use of the functional availability theory to demonstrate the lack of an essential element of the case (price discrimination), as alleged by Metro. **See** Kintner & Bauer, 3 Federal Antitrust Law, § 25.7, (1983) ("availability" is technically not an affirmative defense, but the negation of an element of the plaintiff's case).

functioned to ensure that all Ford dealers issuing bids to the same customer received equal CPA, and that all Ford dealers could meet the competition from other original equipment manufacturers. Metro concedes that the discounts were available to it on an equal basis with other Ford dealers. We therefore must find and conclude that price discrimination did not exist, and that no violation of the Robinson-Patman Act occurred.

Having found the grant of summary judgment in favor of Ford on Metro's federal antitrust claims to be appropriate, we turn to Ford's cross-appeal wherein it challenges the remand of its third-party RICO claim and the pendent state law claims.[17] Ford contends that the district court had no legal authority to remand its RICO claim to state court because the claim arose under federal law and was filed in federal court. Ford further contends that because the RICO and state law claims are interrelated, the factors of judicial economy, convenience, fairness, and comity require that all the claims be tried in the same court, making the remand of the pendent state law claims improper. We review *de novo* whether the legal authority

---

[17] As an initial matter, we note that Metro contends that this issue was mooted by the state court's dismissal of Ford's RICO claim. Ford challenges this contention, and also submits that the remand of the state law claims remains at issue. Although we earlier were advised that the state law claims were scheduled to be tried in state court beginning in April 1998, we have received no additional information. Nevertheless, given our conclusion herein, *infra*, we need not resolve this dispute.

to remand existed and, further, review the decision to remand for an abuse of discretion.[18]

The essential concept governing in this appeal, perhaps overlooked by Ford, is that the district court's jurisdiction was derived from a § 1441 removal.[19] When an action is brought to federal court through the § 1441 mechanism, "for both removal and original jurisdiction, the federal question must be presented by plaintiff's complaint as it stands at the time the petition for removal is filed and the case seeks entry into the federal system. It is insufficient that a federal question has been raised as a matter of defense or as a counterclaim."[20] Similarly, the defendant's third-party claim alleging a federal question does not come within the purview of § 1441 removability.[21] The third-party claim, like a defense or counterclaim, is a pleading by the defendant. The third-party claim does not change the character of the plaintiff's complaint any more than does the

---

[18] **Eastus v. Blue Bell Creameries, L.P.**, 97 F.3d 100 (5th Cir. 1996). The remand order was based on the district court's discretionary power under § 1441(c) and, thus, § 1447(d) does not bar review. **Id.**

[19] 28 U.S.C. § 1441.

[20] 14A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3722, at 255-60. **See Gully v. First Nat'l Bank**, 299 U.S. 109 (1936).

[21] While a third-party defendant may remove a case to federal court based on the third-party claim, a defendant/third-party plaintiff may not. **See Carl Heck Engineers, Inc. v. Lafourche Parish Police Jury**, 622 F.2d 133 (5th Cir. 1980).

defendant's other pleadings. Thus, the federal question alleged in the defendant's third-party claim does not, in and of itself, confer jurisdiction upon the federal court.

The initiation of Ford's third-party claim in federal court, as opposed to that in state court prior to removal, does not change its status. Such a result would be contrary to the rule that removal jurisdiction must be disclosed on the face of the plaintiff's complaint,[22] and that the basis to determine removal jurisdiction so continues throughout the litigation.[23] To hold otherwise would unduly grant a defendant the power to manipulate removal jurisdiction once in federal court, despite overwhelming authority proscribing same.

Having determined that Ford's filing of its third-party RICO claim in federal court after removal does not impact the court's removal jurisdiction and its

---

[22] **Great Nothern Ry. Co. v. Alexander**, 246 U.S. 276, 281 (1918) ("It is also settled that a case, arising under the laws of the United States, nonremovable on the complaint, when commenced, cannot be converted into a removable one by evidence of the defendant ..., but that such conversion can only be accomplished by the voluntary amendment of his pleading by the plaintiff....").

[23] **Id.** at 282 ("the plaintiff may by the allegations of his complaint determine the status with respect to removability of a case, arising under a law of the United States, when it is commenced, and [] this power to determine the removability of his case continues with the plaintiff throughout the litigation, so that whether such a case nonremovable when commenced shall afterwards become removable depends not upon what the defendant may allege or prove ..., but solely upon the form which the plaintiff by his voluntary action shall give to the pleadings in the case as it progresses towards a conclusion.").

14

corresponding remand authority, we turn to the remand decision.[24]   After

dismissing the federal antitrust claims, the court determined that state law

predominated over the remaining claims, and that the interests of judicial economy,

convenience, fairness, and comity warranted remand under § 1441(c).

Section 1441(c) provides:

> Whenever a separate and independent claim or cause of action within
> the jurisdiction conferred by section 1331 of this title is joined with
> one or more otherwise non-removable claims or causes of action, the
> entire case may be removed and the district court may determine all
> issues therein, or, in its discretion, may remand all matters in which
> State law predominates.

Thus, for remand to be proper, the claim remanded must be "(1) a separate and

independent claim or cause of action; (2) joined with a federal question; (3)

otherwise non-removable; and (4) a matter in which state law predominates."[25]

As an initial matter, we consider Ford's contention that district courts have

no authority to remand federal claims.  Although RICO is a federal cause of action,

state courts have concurrent jurisdiction to adjudicate civil claims arising

---

[24] Once the claims on which removal jurisdiction was based were dismissed, the district court rightfully reevaluated its jurisdiction and the position of the action. **See Menchaca v. Chrysler Credit Corp.**, 613 F.2d 507, 511 (5th Cir. 1980) ("It is axiomatic that a district court may inquire into the basis of its subject matter jurisdiction at any stage of the proceedings.").

[25] **Eastus**, 97 F.3d at 104.

thereunder.[26]  Thus, any attempt to equate "original jurisdiction" with "exclusive jurisdiction" in this instance would be error.[27]  The cases relied on by Ford are distinguishable because therein the court sought to remand federal claims which would have been otherwise removable.[28]  As discussed *supra*, Ford's third-party RICO claim could not, and did not, confer removal jurisdiction in this instance.  In addition, we have since noted that the new § 1441(c) permits courts to remand an entire action, or distinct claims, both state and federal, if state law predominates.[29]  We thus must find no merit in Ford's contentions.

In the case at bar, the federal antitrust claims constituted the basis of the court's removal jurisdiction, and were joined with Ford's third-party RICO claim.  Because the third-party RICO claim could not provide removal jurisdiction, it

---

[26] **Tafflin v. Levitt**, 493 U.S. 455 (1990).

[27] If the federal claim in this case fell within the court's exclusive jurisdiction, rather than concurrent, remand of the claim would be improper because the state court would be unable to hear the federal claim.  Accordingly, a federal claim within the court's exclusive jurisdiction would not implicate § 1441 removal jurisdiction because the state court would have no jurisdiction at the outset. **See Arizona v. Manypenny**, 451 U.S. 232 (1981).

[28] **Buchner v. FDIC**, 981 F.2d 816 (5th Cir. 1993) (plaintiff's complaint conferred removal jurisdiction over claim sought to be remanded); **In re Wilson Industries, Inc.**, 886 F.2d 93 (5th Cir. 1989) (same); **Burks v. Amerada Hess Corp.**, 8 F.3d 301 (5th Cir. 1993) (same); **Smith v. Texas Children's Hosp.**, 84 F.3d 152 (5th Cir. 1996) (same).

[29] **Eastus**, 97 F.3d 100 (and cases cited therein).  **See also** 14A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3724 (Supp. 1997) (and cases cited therein).

qualifies as an "otherwise non-removable" claim. Thus, only the first and fourth elements of the § 1441(c) analysis can be disputed.[30]

The first element requires independence as well as separateness. "[W]here there is a single wrong to [the] plaintiff, for which relief is sought, arising from an interlocked series of transactions, there is no separate and independent claim or cause of action under § 1441(c)."[31] "If one claim depends on establishing liability under the other, the two cannot be found to be independent."[32]

We find that, in this case, the federal antitrust claims and the RICO claim are separate and independent. Metro sought relief from Ford based on its implementation of the CPA program, alleging price fixing and discrimination under the federal antitrust laws. In its third-party RICO action, Ford sought relief from Foley for alleged fraud and misrepresentation in the operation of the Metro dealership. Although the CPA program was involved in both the antitrust and RICO actions, the claims rely on different supporting facts and clearly seek separate relief for distinct wrongs.

---

[30] We note that Ford misapplies the § 1441(c) analysis by assuming that the RICO claim forms the basis of jurisdiction and must be considered in relation to the state law claims. As discussed *supra*, this is error.

[31] **American Fire & Casualty Ins. Co. v. Finn**, 341 U.S. 6, 14 (1951).

[32] **Eastus**, 97 F.3d at 104.

17

Ford concedes that the RICO claim and the pendent state law claims are substantially related, calling for litigation in one forum. In fact, the RICO claim is so intertwined with the state law claims as to be difficult to treat separately. We perceive no incompatibility between state court jurisdiction and federal interests[33] and, thus, find that state law predominates. Accordingly, we find and conclude that § 1441(c) authorized remand of the third-party RICO claim, and we affirm that portion of the order. In light of this conclusion, and considering the interests of judicial economy, convenience, fairness, and comity, we must conclude that the district court did not abuse its discretion in correspondingly remanding the pendent state law claims.[34]

The judgment appealed is AFFIRMED.

---

[33] **See Tafflin**, 493 U.S. 455.

[34] **See** 28 U.S.C. § 1367(c); **Carnegie-Melon University v. Cohill**, 484 U.S. 343 (1988).