**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**
**No. 00-50609**

**UDV NORTH AMERICA, INC.,**

Plaintiff - Counter Defendant -
Appellant-Cross-Appellee,

**versus**

**TEQUILA CUERVO LA ROJENA, S.A. DE C.V.; ET AL.,**

Defendants,

**TEQUILA CUERVO LA ROJENA, S.A. DE C.V.,**

Defendant - Counter Claimant -
Appellee-Cross-Appellant.

_____

**Appeal from the United States District Court**
**for the Western District of Texas**
**(SA-98-CV-583-PMA)**
_____

**September 26, 2001**

Before POLITZ and BARKSDALE, Circuit Judges, and FALLON, District Judge:[1]

PER CURIAM:[2]

Primarily at issue is whether Tequila Cuervo La Rojena, S.A. de C.V. (Cuervo), is entitled to terminate a 1991 Trademark License Agreement with Heublein, Inc. (now known as UDV North America, Inc.

---

[1]District Judge for the Eastern District of Louisiana, sitting by designation.

[2]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

(appellant UDVNA)), as a result of the merger of Heublein's indirect parent, Grand Metropolitan plc, and Guinness plc, and pursuant to a provision in the Agreement prohibiting, without Cuervo's prior written consent, "any merger or other act which results in Grand Metropolitan losing control of", *inter alia*, Heublein. UDVNA appeals the summary judgment granted Cuervo on the ground that UDVNA breached that provision. Cuervo cross-appeals, challenging several evidentiary rulings and the dismissal of its damages claim. **AFFIRMED in part; VACATED in part; and REMANDED**.

## I.

Heublein began distributing José Cuervo tequila in the United States in 1966. Between then and 1997, Heublein underwent numerous corporate ownership and management changes.

In 1987, Grand Metropolitan plc (GrandMet), a publicly-traded British company, acquired Heublein from R.J. Reynolds (which had acquired Heublein in 1982). Heublein became an indirect subsidiary of GrandMet and its wine and spirits division, International Distillers and Vintners Limited (IDV); Heublein's direct parent was Heublein Holdings Corporation (Heublein Holdings).

In 1991, Cuervo and Heublein entered into the Trademark License Agreement which, *inter alia*, granted Heublein the exclusive right to distribute Cuervo's tequila products in the United States until expiration of the Agreement (the end of 2010). The present

2

dispute involves the interpretation of Agreement ¶ 13, entitled "Assignability":

> (a) Since HEUBLEIN and CUERVO's predecessor in title have a long-established and satisfactory business relationship, and taking into consideration the personality and status of HEUBLEIN and CUERVO ["*intuitu personae*" in the controlling Spanish language version of Contract], subject to the exceptions herein, it is strictly forbidden for HEUBLEIN or CUERVO to sublicense, transfer or assign totally or partially to another person, company, or entity or partially to another person, company, or entity the rights or obligations under this Agreement without the prior written consent of the other party.

> (b) Without limiting Paragraph 13(a) above, the following acts cannot be made without the prior written consent of CUERVO:

>> (i) A transfer, exchange or assignment by Grand Met of the controlling shares of HEUBLEIN or of I.D.V. or of HEUBLEIN's parent company, so Grand Met loses control of any such companies;

>> (ii) *any merger or other act which results in Grand Met losing control of HEUBLEIN, or I.D.V. or HEUBLEIN's parent company* ["*de la compañia que controle a HEUBLEIN*" in the Spanish version] ....

(Emphasis added.) Subpart (c), which lists certain transactions which "shall not be considered to fall within" the scope of subpart (a), does *not* include mergers by GrandMet.

On 1 July 1997, Heublein changed its name to IDV North America (IDVNA). That December, GrandMet merged with Guinness plc (Guinness), also a publicly-traded British company. The merger was accomplished under British law, pursuant to a "Scheme of

3

Arrangement", in which, in exchange for their shares in GrandMet, GrandMet's shareholders obtained shares in Guinness, which was renamed Diageo plc. Following the merger, GrandMet continued to exist as a wholly-owned, indirect subsidiary of Diageo. Post-merger, GrandMet functions as an intermediate holding company; it owns all the shares of its subsidiaries, including: UDVNA; Heublein Holdings (UDVNA's parent); and IDV (now known as United Distillers & Vintners (HP) Limited (UDV (HP)). Based on the market capitalization of GrandMet and Guinness, GrandMet's shareholders received a 52.7 percent stake in Diageo; Guinness', 47.3 percent.

On 1 February 1998, Cuervo notified UDVNA it was terminating the Agreement, claiming, *inter alia*, that, as a result of the merger, GrandMet had lost control of Heublein. Shortly thereafter, the parties entered into a standstill agreement, pursuant to which they have continued their commercial relationship. The standstill agreement stays the effective termination date of the Agreement, so long as UDVNA, in Cuervo's sole discretion, is negotiating for a new contract in good faith and in a timely manner.

The following July, IDVNA changed its name, as mentioned, to UDVNA; and IDV became, as mentioned, UDV (HP). Guinness' wholly owned spirits subsidiary, United Distillers (UD), was renamed United Distillers & Vintners (ER) Limited (UDV (ER)), and remained a wholly-owned subsidiary of Diageo until June 1999, when it became a wholly-owned subsidiary of UDV (HP) (formerly IDV).

4

Also in July 1998, UDVNA filed this action against Cuervo, seeking a declaration that the merger did not result in GrandMet's losing control of Heublein. Cuervo counterclaimed, *inter alia*, that the merger caused such loss of control, entitling it to terminate the Agreement.[3] The parties consented to proceed before a magistrate judge.

In July 1999, the magistrate judge denied cross-motions for summary judgment on the loss-of-control issue. The motions were renewed post-discovery. In March 2000, the magistrate judge granted Cuervo's motion, holding the merger resulted in GrandMet's losing control of Heublein. That May, prior to commencement of trial on damages, the magistrate judge ruled Cuervo was not entitled to seek disgorgement of UDVNA's post-merger profits as a remedy for breach of the loss-of-control provision, and excluded much of Cuervo's damages evidence. As a result, Cuervo chose not to proceed to trial; its damages claims were dismissed with prejudice.

---

[3]In addition to asserting breach of the loss-of-control provision, Cuervo also asserted other termination bases. Those other bases were severed and abated, and are not at issue on appeal. Accordingly, not properly before us is Cuervo's contention that termination of the Agreement is also justified by GrandMet's disclosure to Guinness of confidential information about Cuervo, in violation of the Agreement's prohibition on revealing such information to third parties.

II.

In contesting the summary judgment on the breach of the loss-of-control provision, UDVNA contends: judgment should instead be granted UDVNA, because the merger did not result in GrandMet's losing control of Heublein; alternatively, judgment is inappropriate because the loss-of-control provision is ambiguous, and therefore presents a material fact issue regarding the parties' intent.

Cuervo seeks a new trial on damages. It challenges the exclusion of evidence regarding damages, as well as the ruling that disgorgement of UDVNA's post-merger profits is not an available remedy.

A.

Needless to say, we review a summary judgment *de novo*, using "the same criteria as the district court, viewing all facts, and the inferences to be drawn from them, in the light most favorable to the non-movant[]". ***Forsyth v. Barr***, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994). The judgment is proper if, in the light of the summary judgment record, "'there is no genuine issue as to any material fact and the mov[ant] is entitled to a judgment as a matter of law'". ***Id***. (quoting FED. R. CIV. P. 56(c)).

"[T]he substantive law will identify which facts are material". ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248

6

(1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude ... summary judgment."  *Id*.  "[A] dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmov[ant]".  *Id*.

The Agreement states it will be interpreted in accordance with Texas law.  That law provides:  "The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument".  *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).  Of course, "[w]hen a contract is not ambiguous, the construction of the written instrument is a question of law for the court".  *MCI Telecomm. Corp. v. Tex. Utilities Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999).  On the other hand, "[i]f a contract is ambiguous, summary judgment is inappropriate because the interpretation of a contract is a question of fact".  *Geoscan, Inc. of Tex. v. Geotrace Tech., Inc.*, 226 F.3d 387, 390 (5th Cir. 2000) (internal quotation marks and citation omitted).  Accordingly, as an initial matter, we must decide whether the loss-of-control provision is ambiguous; that decision is a question of law.  *See* *Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex. 1996); *see also* *Geoscan*, 226 F.3d at 390.  "This determination is made by looking at the contract as a whole in light of the circumstances present when the parties entered the contract."  *Friendswood*, 926 S.W.2d at 282.

But, "[p]arol evidence is not admissible for the purpose of creating an ambiguity". *Nat'l Union*, 907 S.W.2d at 520.

"If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous." *Nat'l Union*, 907 S.W.2d at 520. But, "if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous". *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). "A term is not ambiguous because of a simple lack of clarity." *DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999). And, "[a]mbiguity does not arise simply because the parties advance conflicting interpretations of the contract; rather, for an ambiguity to exist, both interpretations must be reasonable". *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000).

The magistrate judge held that, because the Agreement provides Texas law governs its interpretation, and because that law provides a definition of "control" in a corporate setting, the loss-of-control provision is not ambiguous. That cited definition is found in the Texas Business Corporation Act (TBCA):

> "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies

8

> of a person, whether through the ownership of
> equity securities, by contract, or otherwise.

TEX. BUS. CORP. ACT ANN. art. 13.02A(5) (Vernon Supp. 2001).

In a very thorough and detailed opinion, the magistrate judge concluded:  post-merger-GrandMet has only so much power to control its subsidiaries as Diageo delegates and allows; therefore, Diageo, not GrandMet, controls Heublein (now UDVNA); and, therefore, GrandMet lost control over Heublein, within the meaning of Agreement ¶ 13(b)(ii).  The magistrate judge articulated several bases for that conclusion.

First, unlike pre-merger-GrandMet, which was the "top company" in its corporate group and, through its board of directors and the board's executive committee, controlled Heublein and IDV, post-merger-GrandMet became a wholly-owned subsidiary of Diageo, which has the power to appoint GrandMet's directors; and Diageo has delegated all the authority to direct UDVNA's operations to its own executive committee, and has not delegated any authority to GrandMet.

Second, the magistrate judge held that "control", as used in ¶ 13(b)(ii), was not synonymous with "ownership", because ¶ 13(b)(i) addresses changes in ownership (the paragraph refers to the "transfer, exchange or assignment by GrandMet of the controlling shares"), and ¶ 13(b)(ii) was intended to be much broader; therefore, post-merger-GrandMet's ownership of all UDVNA's stock does not constitute "control".  The magistrate judge held

9

that UDVNA's reliance on the TBCA's provision that "beneficial ownership of ten percent or more of" the outstanding shares "creates a presumption" of control, TEX. BUS. CORP. ACT ANN. art. 13.02A(5), was misplaced, because: Diageo owns more than ten percent of GrandMet's stock and, therefore, would control GrandMet and each of its subsidiaries; and, in any event, the presumption of control arising from GrandMet's ownership of all UDVNA's stock was rebutted by Cuervo's summary judgment evidence, which established that GrandMet did not exercise any control over UDVNA's management and policies. The magistrate judge therefore rejected UDVNA's contention that actual exercise of the power to control is not essential.

Relying on the same distinction between ownership and control, the magistrate judge also rejected UDVNA's contention that GrandMet continues to control UDVNA based on its dominance of the merger (approximately 53 percent of the original shares of Diageo were held by former GrandMet shareholders), and the relatively few changes in key personnel involved in the Cuervo-UDVNA relationship. The magistrate judge acknowledged that "indirect" control could satisfy ¶ 13(b)(ii), but only so long as it is "ultimate" control.

Third, the magistrate judge relied on ¶ 13(c)'s list of transactions excluded from the transfer prohibition in ¶ 13(a); that list does not include transactions such as the Guinness/GrandMet merger. The magistrate judge reasoned that ¶ 13(c)(i), excluding from the transfer prohibition an "inter-company

10

transfer of control of Heublein within the companies currently owned by GrandMet or which are created hereafter by GrandMet solely for tax or administrative purposes and thereafter remains so constituted", illustrated the parties' intent that other transfers of control were understood to fall within the scope of ¶ 13(b)(ii).

Finally, the magistrate judge observed that UDVNA's interpretation of "control" appeared to be in direct conflict with the position adopted by Guinness for a settlement agreement resolving an objection to the merger by Louis Vuitton Moët Hennessy (LVMH), one of Cuervo's competitors. LVMH had objected on the ground that GrandMet would control the post-merger company because 53 percent of Diageo would be owned by GrandMet shareholders, in violation of a provision in LVMH's contract with Guinness. The Guinness/LVMH settlement agreement provides:

> The Parties understand that following the Merger there may be a reorganization of the Guinness Group including the combination of UD with IDV. The Parties acknowledge that such reorganization will not give rise to control event or equivalent provisions under the [LVMH/Guinness contracts], provided that all companies remain, directly or indirectly, wholly controlled by Guinness.

Characterizing the "control" language in the LVMH/Guinness contract as "parallel" to the "control" clause in the Cuervo/Heublein Agreement, the magistrate judge concluded that the LVMH/Guinness settlement reflected Guinness' recognition that "ownership" is distinguishable from "control".

11

Cuervo endorses the magistrate judge's interpretation, asserting the merger resulted in GrandMet's losing the power to direct or cause the direction of UDVNA's management and policies, because, post-merger, Diageo, not GrandMet, exercises that power by virtue of its ownership of GrandMet and its refusal to delegate any managerial authority over UDVNA's operations to GrandMet. Moreover, pre-merger-GrandMet's corporate group was expanded, as a result of the merger, by the admission of parties who had been direct competitors of pre-merger-GrandMet (Guinness and LVMH).

Cuervo points out that pre-merger-GrandMet: through its board, actively controlled the activities of Heublein; was a publicly traded corporation, with its own executives and hundreds of employees in numerous divisions; and was the top company in its corporate group. In contrast, post-merger-GrandMet: became one of Diageo's wholly-owned subsidiaries, resulting in Diageo's having the power to appoint GrandMet's directors; no longer has any active committees, executives, separate place of business, or payroll; has nothing to do with the direction of management or policies of the alcoholic beverage business, but instead conducts only transactions that have a finance or tax purpose; and cannot exercise any control over UDVNA because Diageo has delegated the authority to control UDVNA to UDVNA's executive committee, not to GrandMet.

Cuervo also relies heavily on the inclusion of the phrase "*intuitu personae*" in the Spanish version of the Agreement to

12

describe the relationship between Heublein and Cuervo's predecessor, signifying a trust relationship built on moral character and integrity, one that prohibits the intrusion of third parties. According to Cuervo, in order to function effectively in a national market such as the United States, the owner of a privately held trademarked alcoholic beverage, such as Cuervo, must distribute its products by entering into a licensing agreement with one of a limited number of international distributors. Because those distributors generally own the products they distribute, the distributors' natural self-interest is to exert their best efforts on behalf of their corporate group-owned products. Therefore, Cuervo exercised special care in executing its licensing agreements to assure its products were entrusted to only carefully selected organizations that it could trust to nurture and exploit Cuervo's products, despite overriding corporate group self-interests. Cuervo maintains the Guinness/GrandMet merger violated the essence of the Agreement and the *intuitu personae* relationship between Heublein and Cuervo, which had existed for over 30 years, by allowing the intrusion of Guinness, a competitor, to take over the corporate group and combine its portfolio of brands with GrandMet's portfolio. According to Cuervo, the principles of *intuitu personae* alone should justify its termination of the Agreement.

UDVNA does not challenge the applicability of the TBCA definition, but it contends the definition does not support the

13

magistrate judge's interpretation of the loss-of-control provision. Although UDVNA concedes post-merger-GrandMet does not have the management functions it exercised pre-merger, it contends GrandMet continues nevertheless to control Heublein (now UDVNA), either by virtue of its ownership of all UDVNA's shares, or, in a practical sense, because GrandMet dominated the merger and former GrandMet executives control the management of Diageo.

UDVNA maintains ¶ 13(b)(ii) was not intended to address a change or loss of control of GrandMet or to provide that control is lost if a second entity also comes to control Heublein concurrently with GrandMet. According to UDVNA, both the Agreement and the TBCA definition of "control" contemplate Heublein can be controlled concurrently by more than one entity; and, therefore, the magistrate judge erred by interpreting the loss-of-control provision to require that GrandMet have "ultimate" control over Heublein by virtue of being the "top company" in the corporate group.

In support of its concurrent-control interpretation, UDVNA relies on ¶ 13's references to Heublein's "parent company" ("*de la compañia que controle a HEUBLEIN*" in the Spanish version of the Agreement). According to UDVNA, the use of that language to describe Heublein Holdings, Heublein's direct parent, reflects the parties' understanding that, when the Agreement was executed,

14

Heublein was concurrently controlled by both indirect and direct parent companies (GrandMet and Heublein Holdings).

UDVNA contends further that the references to Heublein Holdings contradict the magistrate judge's and Cuervo's interpretation that control means "ultimate" or "top-company" control. According to UDVNA, Heublein Holdings' control of Heublein was not "ultimate" control, because pre-merger-GrandMet had "ultimate" control of Heublein; Heublein Holdings did not actually exercise its legal power to direct Heublein's management, but was instead simply a holding company established for tax purposes. Therefore, with respect to "control", post-merger-GrandMet is essentially indistinguishable from pre-merger-Heublein Holdings: both were intermediate non-operating holding companies subject to control and management oversight by an ultimate parent; both had the power to direct Heublein's business through 100 percent share ownership, although neither actively exercised that power; and both had the power to direct Heublein concurrently with their ultimate parent's broader powers. UDVNA asserts that, because the parties accepted that in 1991 Heublein Holdings as well as GrandMet controlled Heublein, and because post-merger-GrandMet holds the same power as pre-merger-Heublein Holdings, it cannot have lost control of Heublein.

As further support for its concurrent-control interpretation, UDVNA relies on the TBCA's establishment of a presumption of control based on ownership of more than ten percent of a

15

corporation's stock.  TEX. BUS. CORP. ACT ANN. art. 13.02A(5). According to UDVNA, that presumption illustrates the inclusiveness of the TBCA's definition of "control", as well as the TBCA's contemplation that multiple parties can control a corporation concurrently.  UDVNA contends further that the TBCA's definition of control does not require the exercise (as opposed to possession) of the power to control; therefore, the magistrate judge erred by concluding that Diageo's exercise of power over UDVNA rebutted the presumption of control established by GrandMet's ownership of all UDVNA's shares.

UDVNA also contends the magistrate judge erred by concluding: the concept of control in ¶ 13(b)(ii) could not refer to changes in share ownership of Heublein because such changes are covered by the prohibition against share transfers in ¶ 13(b)(i); and, therefore, ¶ 13(b)(ii) must refer to changes in the control of GrandMet rather than of Heublein.  UDVNA notes ¶ 13(b)(i) covers transfers of shares owned by GrandMet, but not other kinds of transactions that could result in GrandMet's not owning a majority of Heublein's shares, such as, for example, Heublein's issuing new shares to raise capital, which would not be an assignment or transfer prohibited under ¶ 13(b)(i), but could, as a result of share dilution, result in GrandMet's owning only a minority interest in Heublein, and thus losing control of it.

UDVNA also contests the magistrate judge's reliance on ¶ 13(c)'s omission of transactions such as the Guinness-GrandMet

16

merger from the list of transactions expressly permitted under that paragraph to support her conclusion that "control" means "ultimate control" that can be held by only one entity. According to UDVNA, the fact that transactions such as the GrandMet/Guinness merger are not expressly permitted by ¶ 13(c) does not mean they are covered by ¶ 13(b)(ii).

UDVNA disputes the magistrate judge's conclusion that UDVNA's interpretation of "control" is inconsistent with the position taken by Guinness in its settlement of LVMH's objection to the merger. According to UDVNA, the LVMH/Guinness contract definition of "control event" was different from ¶ 13(b) of the Cuervo/Heublein Agreement, and was triggered only if a Guinness competitor came to hold 34 percent or more of the outstanding shares or voting rights in Guinness; therefore, the magistrate judge misunderstood the LVMH contract to require Guinness to control its corporate group. And, because the LVMH/Guinness settlement agreement refers to control over the combination of UD (Guinness' spirits business) and IDV (GrandMet's spirits business), its requirement that "Guinness" remain in control could only have been intended to refer to post-merger-Guinness, *i.e.*, Diageo.

As additional support for its concurrent-control interpretation, UDVNA contends Texas law requires construing narrowly restrictions on the transferability of stock. *See Tenneco Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996)

17

("Sound corporate jurisprudence requires that courts narrowly construe ... provisions that effectively restrict the free transfer of stock.").

UDVNA maintains that, even if GrandMet's 100 percent share ownership of UDVNA is insufficient to establish control, GrandMet's dominance of the merger establishes that it did not lose control of Heublein. According to UDVNA, although the merger was structured technically as an acquisition of GrandMet's shares by Guinness, it was, in reality, a combination of the businesses, in which GrandMet was the dominant party. UDVNA notes Diageo is majority-owned by GrandMet shareholders; is dominated by GrandMet executives; and represents the continuation of GrandMet's business in its prior form, but with a new name and expanded structure.

Alternatively, UDVNA contends the Agreement's references to "control" and "merger ... resulting in [GrandMet's] losing control" are ambiguous; and therefore, the case should be remanded for trial so that the ambiguities can be resolved by extrinsic evidence, including that Heublein twice rejected Cuervo's attempts to expand ¶ 13(b) to encompass changes in the control of GrandMet. UDVNA asserts that Cuervo compounds the ambiguity with its insistence that "*intuitu personae*", which appears in ¶ 13(a), affects the interpretation of ¶ 13(b)(ii).

The interpretation of "control" urged by Cuervo and adopted by the magistrate judge is reasonable: the Agreement requires

18

GrandMet to exercise the ultimate power to control the management and policies of Heublein/UDVNA. At the time the Agreement was entered into, GrandMet headed the corporate group of which Heublein was a part, and it exercised the power to control Heublein's management and policies. Thus, particularly in the light of the longstanding relationship between Heublein and Cuervo, it is reasonable to interpret the loss-of-control provision as requiring that GrandMet retain and exercise ultimate control over Heublein's management and policies. The summary judgment evidence lends support to the magistrate judge's conclusion that, as a result of the merger, Diageo, not GrandMet, actually exercises the ultimate power to control UDVNA's management and policies.

On the other hand, the interpretation advanced by UDVNA is also reasonable in that: the Agreement contemplates concurrent control over Heublein by more than one entity; GrandMet retained control of UDVNA post-merger, either by virtue of its ownership of all UDVNA's shares or its dominance of the merger and Diageo's management; and ¶ 13(b)(ii) was not intended to cover changes in the control of GrandMet. UDVNA presented summary judgment evidence reflecting that former GrandMet executives dominate Diageo's management, and that the key personnel involved in handling Cuervo's brands pre-merger continue post-merger to perform the same functions. In the light of that evidence, the Agreement's references to Heublein Holdings as the company that "controls" Heublein, and the undisputed fact that GrandMet, although no longer

19

the top company in its corporate group, continues to own all UDVNA's shares, the loss-of-control provision could reasonably be interpreted as not applying to the GrandMet/Guinness merger.

In sum, because there is more than one reasonable interpretation of the loss-of-control provision, it is ambiguous. *See* **Lopez**, 22 S.W.3d at 861; **Columbia Gas Transmission Corp.**, 940 S.W.2d at 589. Therefore, "summary judgment is inappropriate because the interpretation of [an ambiguous] contract is a question of fact". **Geoscan**, 226 F.2d at 390.

B.

Cuervo contends it is entitled to a new trial on damages, claiming the magistrate judge erred by:  holding disgorgement of UDVNA's profits was not available as a remedy; and excluding the testimony of its expert witness, evidence that UDVNA considered paying Cuervo to reinstate and/or extend the Agreement, and evidence that, post-merger, other alcoholic beverage brands under contract to UDVNA canceled their contracts and obtained new, more lucrative distribution agreements.

1.

UDVNA maintains each cross-appeal issue should be rejected because Cuervo cannot prove that its damages, if any, were caused by the alleged breach of the loss-of-control provision.  UDVNA asserts that, because Cuervo does not dispute that UDVNA's post-merger sales of Cuervo's products have far exceeded contractual

requirements, Cuervo has not identified any injury it suffered as a result of the merger. UDVNA notes that, although Cuervo reserved unilateral power to terminate the standstill agreement on 30 days' notice, it has not done so, because the relationship has been very profitable for Cuervo.

UDVNA is not entitled to dismissal of Cuervo's cross-appeal on this ground. The parties continued to do business under the terms of the standstill agreement, in which Cuervo expressly reserved its right to seek damages for breach of the Agreement.

2.

For Cuervo's disgorgement claim, the magistrate judge held: restitution generally is not available under Texas law where a valid, express contract governs the dispute; and, because UDVNA was not unjustly enriched and owed no fiduciary duties to Cuervo, Cuervo's claim for disgorgement of UDVNA's post-merger profits was not excepted from that rule.

As Cuervo acknowledged at oral argument, it did not plead a breach of fiduciary duty. It further conceded that disgorgement is not available as a remedy for breach of contract unless the contracting parties have a confidential or fiduciary relationship. But, Cuervo maintains that the Agreement's *intuitu personae* and loss of control provisions, which reflect the degree of trust being reposed by Cuervo in UDVNA, and the degree to which UDVNA's unwarranted injection of a third party into the relationship would

21

violate that trust, establish the existence of such a relationship, which gives rise to the availability of disgorgement as a remedy for breach of contract.

"In Texas, a 'fiduciary relationship is an extraordinary one and will not be lightly created.' Fiduciary duties do not abound in every, or even most, garden variety, arms-length contractual relationships, even those among trusting friends." **Stinnett v. Colo. Interstate Gas Co.**, 227 F.3d 247, 253 (5th Cir. 2000) (footnotes and citations omitted). "[M]ere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship." **Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.**, 823 S.W.2d 591, 595 (Tex. 1992) (internal quotation marks and citation omitted).

The contract at issue in **Crim** contained an anti-assignment provision which included a recitation that "[t]his is a personal agreement, involving mutual confidence and trust". **Id**. at 595 n.7. The Texas Supreme Court held: "[R]eliance on the cited contract language as evidence of a confidential relationship is misplaced [because] [s]uch 'boiler plate' language is designed to give the parties some degree of control over with whom they do business, and nothing more". **Id**. at 596. Likewise, the Agreement's recitation regarding an *intuitu personae* relationship between Cuervo's predecessor and Heublein does not transform Cuervo's relationship with Heublein into a fiduciary relationship. Therefore, the

22

magistrate judge did not err by holding Cuervo was not entitled to disgorgement of UDVNA's post-merger profits as a remedy for breach of the loss-of-control provision.

## 3.

Cuervo challenges various evidentiary rulings. We "review the trial court's evidentiary rulings under an abuse of discretion standard". *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 667-68 (5th Cir. 1999). *See* FED. R. EVID. 103.

## a.

In a supplemental interrogatory response, Cuervo stated its damages expert would testify about: Cuervo's damages and the benefits to UDVNA, including profits, from the post-merger relationship with Cuervo. When deposed by agreement of counsel two weeks before trial, the expert gave indefinite answers as to the actual damage calculations, repeatedly stating his trial testimony would show the jury how to calculate damages from a range of values and it was for the jury, and not him, to determine the amount of those damages. Finally, after persistent questioning, he estimated Cuervo's lost profits as between $50 and $135 million.

The magistrate judge granted UDVNA's motion to exclude the expert's testimony based on the lack of a timely and adequate written summary of his opinions. The three-sentence supplemental answer to a written interrogatory was delivered nine months after the deadline to designate experts, more than three months after the

23

discovery cut-off date, and approximately one month before the commencement of the scheduled trial. Because, however, UDVNA had agreed to the designation of the expert, the magistrate judge did not base the exclusion on the lack of timeliness alone. The magistrate judge ruled: the supplemental interrogatory response failed to provide the information required by the local rule,[4] Federal Rule of Civil Procedure 26(a)(2) (disclosure of expert testimony), and the court's scheduling order; to permit the expert to testify would substantially prejudice UDVNA because neither the supplemental interrogatory response nor the deposition provided adequate information to prepare a defense, in that the expert did not give the bases of his opinions, perform a damage calculation, or identify exhibits; and the deposition transcript was inadequate for the court to make **Daubert** findings.

In reviewing for an abuse of discretion the exclusion of an expert witness as a means of enforcing a pretrial order, we consider four factors: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice". **Metro Ford Truck Sales, Inc. v. Ford Motor Co.**, 145 F.3d 320, 324 (5th Cir.

---

[4]The local rules require a party to provide a written summary of an expert's proposed testimony, including all opinions and the basis therefor, references to exhibits used by the witness, a summary of his qualifications, and the method of compensation. *See* W.D. TEX. R. CV-16(e).

24

1998) (internal quotation marks and citations omitted), *cert. denied*, 525 U.S. 1068 (1999).

Cuervo neither provided an explanation for the delay nor asked for an extension. Cuervo asserts UDVNA's agreement not to oppose Cuervo's motion to designate the expert prevented surprise or prejudice. The written summary was intended, however, to prevent surprise as to the content of the expert's testimony, not merely his presence. UDVNA's agreement regarding designation of the expert did not include an agreement to waive the requirements of the local rules. The content of the expert's opinion — damages — was the central issue to be tried to the jury; therefore, obviously, the testimony was important and potential for prejudice inhered both in the inadequacy of the summary and its lack of timeliness.[5] Furthermore, neither party in this action sought a continuance.

There was *no* abuse of discretion in excluding the expert testimony.

b.

The magistrate judge granted UDVNA's motion in limine to exclude evidence that UDVNA or its affiliates considered paying

---

[5]As to the fourth factor, Cuervo maintains the prejudice caused by unjustified delay can be cured on remand. We hardly need mention that, if this were true, the mere presence of an intervening appeal would cure every delay-related prejudice. Furthermore, we are not considering the factors *de novo*, but rather the circumstances surrounding the magistrate judge's decision in order for us to determine abuse of discretion *vel non*.

Cuervo to reinstate and/or extend the Agreement, holding such evidence was not relevant and was inadmissible under Federal Rule of Evidence 408 (offers to compromise).

At a hearing before the magistrate judge, Cuervo's counsel explained that, before Cuervo learned of the proposed merger, GrandMet made pre-merger internal studies valuing its relations with Cuervo at more than $100 million and prepared documents reflecting that it was considering paying that amount to Cuervo to compensate for the change of control. Cuervo asserts that, because it did not know about the proposed merger, there was no dispute and therefore Rule 408 did not apply. Finally, it maintains evidence of the value UDVNA placed on its relations with Cuervo is relevant to demonstrate: retention of the Agreement had value to UDVNA; and UDVNA would be willing to pay Cuervo a substantial sum to avoid the consequences of the change of control effected by the merger.

UDVNA responds that evidence regarding an internal discussion concerning the potential cost of settling Cuervo's expected challenge to the merger by entering a new or amended distribution agreement for an extended term is not relevant to the measure of breach of contract damages. Also, because of Cuervo's long history of challenges to transactions involving Heublein, GrandMet reasonably believed Cuervo would challenge the merger and that settlement negotiations would ensue; therefore, because the claim was likely, Rule 408 precluded admission of the internal settlement discussion in anticipation of a formal claim. It asserts the

discussion was not relevant to show UDVNA valued its contracts with Cuervo; that fact is undisputed.

Finally, UDVNA contends Cuervo's proffer was inadequate: it handed the settlement memo to the magistrate judge for the first time in connection with its request for reconsideration of the magistrate judge's decision to exclude it; and, before the magistrate judge ruled on the requested reconsideration, Cuervo abandoned the trial. Cuervo responds that the proffer was adequate under Rule 103(a)(2) based on counsel's description of the evidence.

We agree with the magistrate judge that the evidence is not relevant: it is not a measure of damages; and UDVNA's valuing the contract is not at issue. Therefore, even assuming the proffer was adequate under Rule 103 and the evidence admissible under Rule 408, there was no abuse of discretion in excluding the evidence of the discussion.

c.

UDVNA moved in limine to exclude evidence that, post-merger, other alcoholic beverage brands under contract to UDVNA canceled their contracts and obtained new, more lucrative distribution arrangements in the open market. The magistrate judge ruled the evidence was not relevant. (The ruling was without prejudice to Cuervo's seeking reconsideration if the trial demonstrated the evidence was relevant.)

27

Cuervo asserts the evidence is relevant because: it supports Cuervo's claim it could have obtained a more lucrative new contract with another distributor in the open market; and shows that the right to terminate because of UDVNA's loss of control was valuable.

That Cuervo's right to terminate the Agreement was valuable, even if true, has no bearing on the quantum or existence of Cuervo's alleged damages. Moreover, the magistrate judge had discretion under Federal Rule of Evidence 403 to exclude the evidence on the basis that it was likely to create a distracting, confusing sideshow.

Cuervo, as the other parties who held contracts with UDVNA, could have sought a new distribution agreement on the open market, but voluntarily chose to continue to do business with UDVNA under the standstill agreement. Therefore, there was no abuse of discretion in finding the evidence of the third-parties' conduct not relevant.

III.

For the foregoing reasons, the dismissal of Cuervo's damages claims is **AFFIRMED;** the summary judgment on the "loss of control" issue is **VACATED**; and the case is **REMANDED** for further proceedings consistent with this opinion.

*AFFIRMED in part; VACATED in part; and REMANDED*

28