*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0082p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SMITH WHOLESALE COMPANY, INC., RICE
WHOLESALE CO., INC., ANDALUSIA DISTRIBUTING
CO., INC., DIXIE TOBACCO & CANDY CO., GEORGE
WHOLESALE CO., LTD., INDEPENDENT WHOLESALE
INC., L.P. SHANKS CO., MCCARTY-HULL CIGAR CO.,
INC., R.C. TAYLOR DISTRIBUTING CO., REIDSVILLE
GROCERY CO., INC., A.B. COKER CO., INC.,
AFFILIATED FOODS, INC., ACADIA WHOLESALE &
TOBACCO CO., CALDWELL WHOLESALE CO., INC.,
NOVELART MANUFACTURING CO., YAKIMA
DISTRIBUTING CO., INC., HUNTSVILLE WHOLESALE
GROCERY, PELICAN STATE CIGAR & TOBACCO, INC.,
                    *Plaintiffs-Appellants,*

STATE OF MISSISSIPPI, and STATE OF TENNESSEE,
                    *Intervenor Plaintiffs,*

M.K. GROCERY CO., INC., and CORSO, INC.,
                    *Plaintiffs,*

> No. 05-6053

        *v.*

R.J. REYNOLDS TOBACCO COMPANY,
                    *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 03-00030—J. Ronnie Greer, District Judge.

Argued: April 21, 2006

Decided and Filed: February 27, 2007

Before: MOORE, GRIFFIN, and CUDAHY, Circuit Judges.[*]

_____

[*] The Honorable Richard D. Cudahy, Senior Circuit Judge of the United States Court of Appeals for the Seventh
Circuit, sitting by designation.

1

———————————

**COUNSEL**

———————————

**ARGUED:** Kyle M. Keegan, ROY, KIESEL, KEEGAN & DeNICOLA, Baton Rouge, Louisiana, for Appellants. Thomas Demitrack, JONES, DAY, REAVIS & POGUE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Kyle M. Keegan, Chris D. Kiesel, ROY, KIESEL, KEEGAN & DeNICOLA, Baton Rouge, Louisiana, Earl R. Booze, HERRIN, BOOZE, RAMBO, JENKINS & WHEELER, Johnson City, Tennessee, for Appellants. Thomas Demitrack, Robert S. Walker, Michelle K. Fischer, JONES, DAY, REAVIS & POGUE, Cleveland, Ohio, William C. Bovender, HUNTER, SMITH & DAVIS, Kingsport, Tennessee, Eric P. Berlin, JONES DAY, Chicago, Illinois, for Appellee.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge. In this case alleging illegal price discrimination in violation of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Price Discrimination Act ("the Act"), 15 U.S.C § 13(a), the plaintiffs-appellants, eighteen full-service wholesalers who are also direct distributors for defendant R.J. Reynolds Tobacco Company ("RJR"), appeal the district court's order of summary judgment entered pursuant to Federal Rule of Civil Procedure 56(c) in favor of defendant RJR. We affirm.

I.

The eighteen plaintiffs-appellants in this case, lead by plaintiff Smith Wholesale Company, are full-service distributors serving grocery and convenience stores and other retail outlets in a multi-state region, primarily in the southeastern United States. Tobacco products constitute 50% or more of their revenues. All of the plaintiffs are direct distributors of defendant RJR, some having distributed RJR's products for more than fifty years. Plaintiffs also purchase cigarettes from all other major manufacturers, as well as fourth-tier manufacturers.

Cigarettes are divided into four price categories or tiers. The most expensive, first-tier or premium, cigarettes are manufactured by defendant RJR (Camel and Winston cigarettes), as well as Philip Morris USA, Inc., Lorillard Tobacco Company, Liggett-Vector Brands, and Commonwealth Brands. Second-tier and third-tier cigarettes are also produced by the major manufacturers, but their prices are substantially lower than first-tier cigarettes. Fourth-tier brands are produced by smaller manufacturers (including Liggett and Commonwealth) and sell at prices somewhat lower than third- tier brands. All of RJR's discounted, non-premium brands are collectively classified as "savings" brands. RJR's second-tier product is Doral; its third-tier cigarettes include Monarch, Best Choice, Citation, and Cardinal. RJR does not price any of its savings brands at the fourth-tier level.

RJR is the second largest cigarette manufacturer in the United States, with a market share of approximately 22% prior to its July 2004 merger with the United States operations of Brown & Williamson.[1] The newly formed Reynolds American now has a market share of approximately 31%. At the other end of the spectrum, the fourth-tier segment has grown from 0.89% of all cigarette sales in 1998 to around 15% in 2003, making it the fastest growing portion of the cigarette market.

———————————

[1]Philip Morris USA, Inc., by contrast, accounted for nearly 50% of all cigarette sales in 2000. Marlboro, Philip Morris's largest brand, commanded a 38% share, over 50% higher than the combined shares of all of RJR's brands.

Competitive pressure increased following the industry's 1998 Master Settlement Agreement, which settled smoking and health litigation by requiring per carton payments to the settling states. That agreement led to the rapid growth of producers of fourth-tier cigarettes that did not make settlement payments. RJR's market share has decreased in this competitive environment.

In April 2000, in an effort to allay its declining market share, RJR sought to enlist wholesalers in RJR's marketing efforts by providing financial incentives to wholesalers willing to focus on RJR savings brands. The new Wholesale Partners Program ("WPP") emphasized its savings brands because of the importance of RJR's Doral savings brand to its overall business. The WPP revised RJR's wholesale pricing structure through a three-level pricing system, ranging from Level 1 (the least favored), Levels 2 "A" through "H," to Level 3 (the most favored), which based price discounts and back-end monies[2] on a comparison of the distributor's sales of RJR's savings brands to its sales of non-RJR savings brands. All wholesalers could earn a base discount by participating in Level 1, although the amount of the Level 1 discount diminished over time until it ended in June 2003. To earn discounts at Level 2 or payments at Level 3, wholesalers were required to meet quarterly targets based on their sales of RJR savings brands as a percentage of their total savings brand sales.

Wholesalers that met their share targets earned the same Level 2 discounts.[3] For five quarters beginning in the third quarter of 2002, wholesalers also earned additional, progressively higher quarter-end payments (so-called Levels 2A through 2H rebates), depending on the extent to which their RJR savings share exceeded the base share targets.[4]

The discount/rebate structure of the WPP is best summarized by the magistrate judge in his Report and Recommendation in this case:

> First, in each state the defendant ascertained what *percentage* of each wholesaler's total sales of savings brand cigarettes consisted of RJR's savings brand cigarettes. Each wholesaler was then ranked in descending order, with the wholesaler having the highest percentage of RJR cigarettes listed at the top, and the wholesaler selling the smallest percentage of defendant's products (relative to the total sales of savings brand cigarettes) at the bottom. The defendant thereupon listed the *volume* of its savings brand cigarettes sold by each of the distributors. It is important to note that the distributor listed at the top, which sold the highest percentage of defendant's products, did not necessarily sell the highest *volume* of defendant's products; indeed, the distributor with the highest percentage of defendant sales very easily could have been the distributor that sold the lowest volume of defendant's products.
>
> After determining the volume of defendant's cigarettes sold by each distributor in the descending order discussed in the preceding paragraph, [defendant] ascertained the

---

[2]Rebates paid to distributors at the close of each quarter.

[3]Wholesalers received certain Level 3 payments (received as quarterly rebates) once they qualified for Level 2 discounts, as long as changes in their RJR share during the relevant quarter did not differ meaningfully from changes in RJR's statewide share during the same period. Level 2 wholesalers also earned other Level 3 rebates to the extent they performed additional functions that RJR sought to reward.

[4]RJR modified the WPP several times from August 2000 to the present. From the second quarter of 2002 through the third quarter of 2003, Level 2 contained the eight price categories (Levels A-H). Level 2A was set at the minimum Level 2 RJR share of savings ("SOS") brands threshold to 1.5 share points above this minimum SOS threshold; only when a distributor exceeded its Level 2A SOS quota by 30.1 points would it then qualify for Level 2H back-end monies. In 2003, RJR again modified the WPP to further reduce the Level 2 and 3 back-end monies available to Level 2A distributors.

*total volume of RJR savings cigarettes sold in each state*.  Defendant then selected as its state target the RJR *percentage* of that wholesaler whose volume sales, when added to all those above it, equaled eighty-five percent (or as close thereto as possible) of defendant's total wholesale volume in the state.  Defendant thereafter calculated a "share-of-savings" target for each wholesaler, using the state targets described above.  The target was stated in terms of defendant's "savings brands" as a percentage of the total sales of cheap cigarettes sold by a distributor.  For those wholesalers doing business in more than one state (and there were several), defendant had yet another formula that adjusted a multi-state wholesaler's target goals to reflect the different states in which that wholesaler does business.  The closer a wholesaler comes to the goal established for it, the higher the incentive level applicable to it.  And the higher the incentive level, the lower the price it pays for defendant's cigarettes.  It is at first difficult to understand, and even more difficult to describe in words, but it does have a mathematical logic to it, and the resulting state target is intended to capture eighty-five percent of the volume of defendant's savings brand in any particular state.

As noted, the incentive level in which any wholesaler was placed determined the amount that wholesaler paid for defendant's savings brand cigarettes.  Obviously, some wholesalers participated at higher levels than others, which meant that they purchased their cigarettes from defendant at a cheaper price.  This price differential resulted in this litigation.

Because participation in the WPP did not depend on the volume of a wholesaler's RJR sales, small wholesalers were treated ostensibly the same as large wholesalers.  From August 2000 through the first quarter of 2004, all discounts and rebates received under RJR's WPP were based solely on a distributor's RJR SOS brands.  Beginning in the second quarter of 2004, RJR adopted a "share of market" approach, whereby WPP quotas, and resultant discount/rebate levels, were thereafter based on the distributor's total RJR sales (savings and premium) as a percentage of all cigarettes it sold.[5]

The WPP's per carton premium brand price differences between Level 1 and the best price from August 2000 to present were approximately:  ($0.55) August 2000 – April 2001; ($0.50) May 2001 – May 2002; ($0.57) June 2002 – December 2002; ($0.85) January 2003 – June 2003; ($1.12) July 2003 – September 2003; ($0.75) October 2003 – March 2004; and ($0.74) April 2004 – present.

All wholesalers entered the program at Level 2.  A Level 2 wholesaler that missed Level 2 in any quarter received a three-month grace period to maintain its Level 2 status.  The WPP placed no limit on the volume that wholesalers could sell to any customer and capped quarterly increases in a wholesaler's target at 0.5%, even if RJR's actual share increased by a larger percentage, while reducing a wholesaler's target by the full amount of any decrease in RJR's actual share.

Fifteen of the eighteen plaintiffs have participated at Levels 2 and 3 at some point since 2000.  However, plaintiffs complain that to attain the best price on RJR products – achieved by fewer than 8% of RJR's direct distributors in 2002 and 2003 – a distributor's RJR savings brand sales were required to meet ever higher percentage quotas.  Plaintiffs allege that it was impossible to meet RJR's SOS targets because they sell to retailers in rural, lower income areas that had a uniquely high demand for the cheapest, fourth-tier cigarettes. Plaintiffs complain that because RJR's highest share quotas, and its most favored prices, are not practically and realistically achievable by

---

[5]Only the WPP for the years 2000-2003 are at issue in the present case.  The 2004-2005 WPP is identical to that of its competitor, Philip Morris USA, Inc.'s Wholesale Leaders Program, which has been similarly challenged as a violation of the antitrust laws and is currently pending before this court.  *See Smith Wholesale Co. et. al. v. Philip Morris USA, Inc*., Case # 05-6481.

plaintiffs, all have been classified as Level 1 distributors (some for the entire complaint period) under the WPP.

On January 31, 2003, plaintiff Smith Wholesale Company filed suit in federal court against defendant RJR alleging that, through implementation of the WPP, RJR engaged in illegal price discrimination in violation of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), and further, that RJR wrongfully terminated its direct purchasing status in retaliation for raising antitrust complaints about the WPP to its retail customers. On February 18, 2003, Smith amended its complaint to add another wholesaler, Rice Wholesale Company ("Rice"), after RJR ended its wholesale agreement with Rice. Smith and Rice filed preliminary injunction motions, seeking reinstatement of their wholesale agreements, which were granted on February 7 and March 4, 2003, respectively.[6]

On June 11, 2003, Smith and Rice amended their complaint for the third time, adding nine additional plaintiffs. Ten of these plaintiffs simultaneously sought a preliminary injunction against the further 1% discount reduction at Level 1 under the 2003 WPP. On July 3 and 14, 2003, the district court granted motions by the states of Tennessee and Mississippi to intervene in the litigation on behalf of their consumers, wholesalers, manufacturers, and the economies of their states.[7] On August 6, 2003, the district court enjoined the 2003 WPP's 1% discount reduction for Level 1 distributors, but later stayed it. Following issuance of the preliminary injunction, additional distributors joined the litigation, and the complaint was amended for the fifth time, to bring the total number of plaintiffs to twenty-two. Plaintiffs seek damages for loss of profits, customers, sales, goodwill, and business value that allegedly resulted from RJR's discriminatory pricing. Plaintiffs also seek permanent injunctive relief.

After discovery concluded, RJR filed a motion for summary judgment, which the district court referred to the magistrate judge who, after hearing extensive argument by the parties, issued a Report and Recommendation advising that RJR's motion for summary judgment should be granted and plaintiffs' complaint dismissed. On June 3, 2005, after full briefing of plaintiffs' objections, the district court issued a Memorandum Opinion and Order, in which it adopted and approved the magistrate judge's Report and Recommendation and granted summary judgment in favor of RJR.

In its decision, the district court concluded that summary judgment was appropriate because RJR's discounts were "functionally available" to the plaintiffs, i.e., "[t]he practice of conditioning price concessions and allowances upon the customer's purchase of a specific quantity of goods will not give rise to a Robinson-Patman violation if the concessions are available equally and functionally to all customers." *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1326 (6th Cir. 1983). The district court opined, in pertinent part:

> [T]his case does not involve a quantity discount, the plaintiffs' [sic] were told about the discount, and the plaintiffs were permitted to participate in the program. The Court FINDS that RJR's discount is available to all customers using a nondiscriminatory formula, even though different customers may pay different prices, and that there is no evidence that the program was not evenly administered. Therefore, this Court FINDS that RJR's discount was functionally available to the plaintiffs in both theory and in fact.

\* \* \*

---

[6]RJR appealed, but voluntarily dismissed its consolidated appeal of those preliminary injunctions on June 27, 2005, after the entry of summary judgment in its favor in the instant case.

[7]The States have not joined in the present appeal from the order granting summary judgment to defendant.

Although the plaintiffs contend that RJR's discounts are not functionally available to them because of the demands of their customers, applicable case law does not support the plaintiffs' conclusion that the demands of a purchaser's customer can render a discount functionally unavailable. Courts have refused to find discrimination when the buyer's inability to take advantage of the best discount was within the control of the buyer, such as poor credit, management choices, decisions not to hold inventory, or particular marketing strategies. *See Bouldis*, 711 F.2d at 1327; *Shreve* [*Equipment, Inc. v. Clay Equipment Corp.*], 650 F.2d [101], 105 [( 6th Cir. 1981)]; *Edward J. Sweeney* [*& Sons Co. v. Texaco, Inc.*], 637 F.2d [105], 121 [(3d Cir. 1980)]; *Chapman v. Rudd Paint & Varnish Co.*, 409 F.2d 635, 643 (9th Cir. 1969).

The Court FINDS that the undisputed fact that an outside influence, not in the control of RJR, i.e. plaintiffs' customer demands, frustrated their performance does not render the discount functionally unavailable. Therefore, because RJR's discount was functionally available, under the undisputed facts of this case, the defendant has demonstrated the lack of an essential element of the plaintiffs' case, i.e. price discrimination.

In this case, the Court also FINDS that there is no causal link between RJR's practices and the plaintiffs' alleged injuries. Plaintiffs contend that they did not make a voluntary choice to emphasize fourth-tier or other non-RJR brand[s] over RJR'[s] products, but that they have simply responded to the demands of their customers. Therefore, by their own admission, the plaintiffs' inability to participate in WPP is attributable to an outside influence over which RJR had no control. In effect, the plaintiffs seek to reap the rewards of the WPP without furthering the purpose of that program, i.e., increasing the demand for RJR products.

The Court FINDS that, because the plaintiffs did not take advantage of a lower price or discount which was functionally available on an equal basis, no price discrimination has occurred. In the alternative, the Court FINDS that any alleged discrimination was not the proximate cause of the plaintiffs' injuries.

Plaintiffs' timely appeal followed.

## II.

This court reviews a district court's decision granting summary judgment de novo. *Kessler v. Visteon Corp.*, 448 F.3d 326, 329 (6th Cir. 2006). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The evidence must be viewed in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences. *Kessler*, 448 F.3d at 329. However, "the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), it must present significant probative evidence in support of its complaint to defeat the motion for summary judgment." *Expert Masonry, Inc. v. Boone County, Ky.*, 440 F.3d 336, 341 (6th Cir. 2006). "A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Kessler*, 448 F.3d at 329.

In this circuit, motions for summary judgment are disfavored in antitrust litigation. *Expert Masonry, Inc.*, 440 F.3d at 341. This general rule, however, does not preclude the use of summary

judgment in an antitrust case in which there clearly are no genuine issues of fact to try – "[i]ndeed, the very purpose of a motion for summary judgment, to eliminate a trial where it would be unnecessary and merely result in delay and expense, warrants summary disposition of such cases when appropriate." *Bouldis,* 711 F.2d at 1324. "Accordingly, 'the absence of any relevant probative evidence in support of a litigant's antitrust claims will expose such claims to summary judgment disposition.'" *Id.* (quoting *Davis-Watkins Co. v. Serv. Merch.*, 686 F.2d 1190, 1197 (6th Cir. 1982)).

III.

A.

Plaintiffs contend that the district court erred in dismissing their claims of illegal price discrimination under § 2(a) of the Clayton Act, as amended by the Robinson-Patman Act. 15 U.S.C. § 13(a) provides, in pertinent part:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided*, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered . . . .

"Essentially, this section makes it unlawful for a seller to discriminate in price between purchasers of the same or similar goods actually sold, whether to the ultimate purchaser or for resale, if the effect of such price discrimination may be to lessen competition substantially in a line of commerce or with the competitors of the seller or its customers." *Bouldis,* 711 F.2d at 1325.

Three categories of competitive injury may give rise to a Robinson-Patman claim: "primary-line" cases involve conduct that injures competition at the level of the discriminating seller and its direct competitors; "secondary-line" cases, like the instant case, implicate price discrimination that injures competition among the discriminating seller's customers, typically referred to as "favored" and "disfavored" purchasers; and "tertiary-line" cases entail injury to competition at the level of the purchaser's customers. *Volvo Trucks North America, Inc.* v. *Reeder-Simco GMC, Inc.* ("*Volvo Trucks*"), 546 U.S. 164; 126 S. Ct. 860, 870; 163 L. Ed. 2d 663 (2006).

A viable secondary-line price discrimination claim brought pursuant to this Act requires proof that "(1) the relevant . . . sales were made in interstate commerce; (2) the [commodities at issue] were of 'like grade and quality'; (3) [the defendant] 'discriminate[d] in price between' [different purchasers of the like commodities]; and (4) 'the effect of such discrimination may be . . . to injure, destroy, or prevent competition' to the advantage of the favored purchaser, *i.e.*, one who 'receive[d] the benefit of such discrimination.'" *Volvo Trucks,* 126 S. Ct. at 870 (quoting 15 U.S.C. § 13(a)).

In the recent *Volvo Trucks* decision, the Supreme Court addressed the issue of secondary-line price discrimination under § 13(a), albeit in a very narrow context.[8] The *Volvo Trucks* decision nonetheless yields important observations about the underlying policy and purpose of the Robinson-Patman Act that are relevant to the present appeal. Justice Ginsburg, writing for the majority, noted that:

> Section 2, "when originally enacted as part of the Clayton Act in 1914, was born of a desire by Congress to curb the use by financially powerful corporations of localized price-cutting tactics which had gravely impaired the competitive position of other sellers." *FTC v. Anheuser-Busch, Inc*., 363 U.S. 536, 543, and n. 6 . . . . Augmenting that provision in 1936 with the Robinson-Patman Act, Congress sought to target the perceived harm to competition occasioned by powerful buyers, rather than sellers; specifically, Congress responded to the advent of large chain stores, enterprises with the clout to obtain lower prices for goods than smaller buyers could demand.

* * *

> Mindful of the purposes of the Act and of the antitrust laws generally, we have explained that Robinson-Patman does not "ban all price differences charged to different purchasers of commodities of like grade and quality," *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp*., 509 U.S. 209, 220, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993) (internal quotation marks omitted); rather, the Act proscribes "price discrimination only to the extent that it threatens to injure competition," *ibid*.

* * *

---

[8]The precise issue addressed by the Court was "whether a manufacturer offering its dealers different wholesale prices may be held liable for price discrimination proscribed by Robinson-Patman, absent a showing that the manufacturer discriminated between dealers contemporaneously competing to resell to the same retail customer[?]" 126 S. Ct. at 866. Reeder, a Volvo dealer, commenced suit against Volvo alleging that its sales decreased because Volvo offered other favored dealers price concessions not offered to Reeder. At issue were specially ordered heavy-duty trucks supplied by Volvo and sold by franchised dealers through a competitive bidding process by which the retail customer stated its specifications and invited bids from dealers franchised by different manufacturers. When a Volvo dealer received the customer's specifications, it contacted Volvo and requested a discount off the wholesale price. Volvo then decided, on a case-by-case basis, whether to offer a discount and, if so, what the discount would be, taking into account such factors as industry-wide demand and the retail customer's history of purchasing certain brands of trucks. The dealer then incorporated the discount offered by Volvo into its bid and purchased the trucks only if the retail customer accepted the bid.

In 1997, Volvo announced a projected reduction in the number of authorized dealers. Coincidentally, Reeder learned that Volvo had given another dealer a price concession greater than the concessions Reeder typically received. Reeder suspected that it was one of the dealers Volvo targeted for elimination. Reeder filed suit, alleging losses attributable to Volvo's purported violations of state law and the Robinson-Patman Act. Reeder prevailed at trial and on appeal to the Eighth Circuit Court of Appeals. The Supreme Court, however, reversed and remanded, concluding that "[a]bsent actual competition with a favored Volvo dealer . . . Reeder cannot establish the competitive injury required under the Act." 126 S. Ct. at 870. The Supreme Court held that Reeder's proffered comparisons fell short of showing price discrimination, because in none of the specific instances upon which Reeder relied did Reeder compete with beneficiaries of the alleged discrimination for the same customer. Moreover, Reeder failed to demonstrate that the compared dealers were consistently favored vis-a-vis Reeder; Reeder merely cited occasions when it competed with non-Volvo dealers for a sale to a customer. The Court noted that "[t]he Act centrally addresses price discrimination in cases involving competition between different purchasers for resale of the purchased product. Competition of that character ordinarily is not involved when a product subject to special order is sold through a customer-specific competitive bidding process." *Id*. at 866. "Here, there is no discrete 'favored' dealer comparable to a chain store or a large independent department store –at least, Reeder's evidence is insufficient to support an inference of such a dealer or set of dealers." *Id*. at 871.

> A hallmark of the requisite competitive injury, our decisions indicate, is the diversion of sales or profits from a disfavored purchaser to a favored purchaser. *FTC v. Sun Oil Co.*, 371 U.S. 505, 518-519, 83 S. Ct. 358, 9 L. Ed. 2d 466 (1963). . . . We have also recognized that a permissible inference of competitive injury may arise from evidence that a favored competitor received a significant price reduction over a substantial period of time. *See FTC v. Morton Salt Co.* ["*Morton Salt*"], 334 U.S. 37, 49-51 (1948) . . . .

126 S. Ct. at 869-70.

> The *Volvo Trucks* Court further explained:

> Interbrand competition, our opinions affirm, is the "primary concern of antitrust law." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 51-52, n.19, 97 S. Ct. 2549, 53 L. Ed. 2d 568 (1977). The Robinson-Patman Act signals no large departure from that main concern. Even if the Act's text could be construed in the manner urged by Reeder and embraced by the Court of Appeals, we would resist interpretation geared more to the protection of existing *competitors* than to the stimulation of *competition*. In the case before us, there is no evidence that any favored purchaser possesses market power, the allegedly favored purchasers are dealers with little resemblance to large independent department stores or chain operations, and the supplier's selective price discounting fosters competition among suppliers of different brands. . . . By declining to extend Robinson-Patman's governance to such cases, we continue to construe the Act "consistently with broader policies of the antitrust laws." *Brooke Group*, 509 U.S. at 220, 113 S. Ct. 2578 (quoting *Great Atlantic & Pacific Tea Co. v. FTC*, 440 U.S. 69, 80, n.13, 99 S. Ct. 925, 59 L. Ed. 2d 153 (1979)) . . . .

*Id*. at 872-73 (footnote omitted).

The Supreme Court's discussion in *Volvo Trucks* regarding the underpinnings of the Robinson-Patman Act serves as a backdrop for our evaluation of plaintiffs' secondary-line price discrimination claim. As the *Volvo Trucks* Court explained and this court has noted, the Robinson-Patman Act was originally enacted in part to "prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power," *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 520 (6th Cir. 2004), and, hence, it is well established, in the context of quantity discounts, that an inference of competitive injury arises from "evidence that some purchasers had to pay their supplier 'substantially more for their goods than their competitors had to pay.'" *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 559 (1990) (quoting *Morton Salt,* 334 U.S. at 46-47).

The WPP, however, is not a quantity discount program; rather, its market-share targets are calculated using a percentage of its savings brand sales rather than a designated quantity, thus distinguishing it from volume discount programs. Such market-share discount pricing structures present different concerns than volume-based discounts. Market-share discounts theoretically level the playing field by allowing competing purchasers of like commodities to participate on equal terms, regardless of size, because such discounts depend not on volume purchases, but on the percentage of purchases of a particular category of products.

There is a dearth of precedent addressing the legality of market-share discount programs under the Act; heretofore, legal challenges to secondary-line pricing practices under § 13(a) have arisen in the original context contemplated by the Act – discriminatory pricing arising from standard quantity discounts. We nonetheless would be remiss if we were to suggest that market-share

discounts are immune from Robinson-Patman scrutiny. It is certainly conceivable that under certain circumstances, as alleged here by plaintiffs, market-share discounts could be administered in such a manner that such incentives cross the fine line from pro-competitive incentives to exclusionary, anti-competitive price discrimination. Indeed, the Supreme Court has noted that price discrimination may arise under various pricing structures, not limited to volume-based discounts:

> While, as noted, the immediate and generating cause of the Robinson-Patman amendments [to the Clayton Act] may have been a congressional reaction to what were believed to be predatory uses of mass purchasing power by chain stores, neither the scope nor the intent of the statute was limited to that precise situation or set of circumstances. Congress sought generally to obviate price discrimination practices threatening independent merchants and businessmen, presumably from whatever source.

*FTC v. Sun Oil Co.*, 371 U.S. 505, 520 (1963). *See also Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1422 n.16 (11th Cir. 1990) ("Though the birth of the RPA was motivated by a desire to place 'big' purchasers on par with 'small' ones, the Act's applicability is not limited to big buyer/small buyer cases. . . . It is one of general applicability and prohibits discriminations generally." (internal citations and quotation marks omitted)).

Consequently, the Supreme Court has prescribed a case-by-case evaluation of antitrust claims: "Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law. This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the particular facts disclosed by the record." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 466-67 (1992) (internal quotation omitted). In sum, regardless of the mechanics of a pricing structure, if there is evidence of discrimination in price between different purchasers of the same commodities, and if the effect of that discrimination may be to substantially lessen competition, then there is a prima facie violation of the Robinson-Patman Act.

B.

"'[A] price discrimination within the meaning of [§ 13(a)] is merely a difference in price.'" *Texaco, Inc.,* 496 U.S. at 558 (quoting *Anheuser-Busch, Inc.*, 363 U.S. at 549). This fundamental, understated principle is by no means simplistic. Although the Robinson-Patman Act "proscribes unequal treatment of different customers in comparable transactions," *FTC v. Borden Co.*, 383 U.S. 637, 643 (1966), "Congress did not intend to outlaw price differences that result from or further the forces of competition[,]" and the Act "should be construed consistently with broader policies of the antitrust laws." *Brooke Group*, 509 U.S. at 220 (quotation omitted). The Act "do[es] not bar a distributor from ever offering lower prices or discounts; instead, [it] prohibit[s] distributors from discriminating among purchasers in doing so." *Krist Oil Co., Inc. v. Bernick's Pepsi-Cola of Duluth, Inc.*, 354 F. Supp. 2d 852, 856 (W.D. Wis. 2005) (citing *Borden*, 383 U.S. at 646). Thus, a manufacturer may utilize promotional arrangements and provide financial incentives to favor its product or even to disfavor competing brands, and manufacturers need not "guarantee that all customers benefit to the same degree," *Comcoa, Inc. v. NEC Tel., Inc.*, 931 F.2d 655, 664 (10th Cir. 1991). Indeed, by definition, an incentive-based program will lead to different outcomes for different purchasers. Incentives and concessions provide greater benefits to those purchasers who choose to align their own competitive objectives with those of their supplier. Commitment to a particular product is the sine qua non of an incentive program. *Precision Printing Co. v. Unisource Worldwide, Inc.*, 993 F. Supp. 338, 352 (W.D. Pa. 1998).

C.

In an effort to better define the parameters of "a difference in price" in secondary-line price discrimination claims under § 13(a), numerous courts, including this court and the district court herein, have utilized the doctrine of "functional availability," a theory that "'is a judicial graft on § 2(a) and is not explicitly embodied in the text of the statute.'" *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 326 (5th Cir. 1998) (quoting *Precision Printing Co.,* 993 F. Supp. at 350).[9] "According to this court-created rule, the plaintiff in a Robinson-Patman Act suit cannot recover damages for lower prices paid by its competitors to the defendant if those same prices were available to the plaintiff from a practical standpoint and on equal terms with its competitors." *Amer. Tara Corp. v. Int'l Paper Co.*, No. 79C1470, 1981 WL 375752, at *1 (N.D. Ill. July 30, 1981) (unpublished).[10] The rationale underlying the doctrine is that functional availability negates two essential elements of a § 13(a) claim: "Where a purchaser does not take advantage of a lower price or discount which is functionally available on an equal basis, it has been held that either no price discrimination has occurred, or that the discrimination is not the proximate cause of the injury." *Shreve Equipment, Inc. v. Clay Equip. Corp.* ["*Shreve*"], 650 F.2d 101, 105 (6th Cir. 1981). *See also Amer. Tara Corp.*, 1981 WL 375752 at *2 ("If the lower prices afforded its competitor were equally available to the plaintiff, any discrimination and competitive advantage suffered by the plaintiff is attributed not to the defendant's program but to the plaintiff's failure to take advantage of its opportunity to receive those prices.").

Plaintiffs maintain that functional availability is an affirmative defense, with the burden of proof placed squarely on defendant to show that RJR's favored price was practically available to all customers. Although several courts have referred to functional availability as a "defense," *see Comcoa, Inc.*, 931 F.2d at 664, *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1516 (11th Cir. 1989), *Allied Sales and Serv. Co.*, 2000 WL 726216 at *17, *Calumet Breweries, Inc. v. G. Heileman Brewing Co.*, 951 F. Supp. 749, 753-55 (N.D. Ind. 1994), and *Cain v. Chevron U.S.A., Inc.*, 757 F. Supp. 1120, 1123 (D. Ore. 1991), we agree with the Fifth Circuit Court of Appeal's assessment, obviously shared by this court in *Shreve*, that functional availability "is technically not an affirmative defense, but the negation of an element of the plaintiff's case." *Metro Ford Truck Sales, Inc.*, 145 F.3d at 326 n.17 (citing Kintner & Bauer, 3 *Federal Antitrust Law*, § 25.7 (1983)). *See also Sweeney & Sons, Inc. v. Texaco, Inc.* ["*Sweeney*"], 637 F.2d 105, 120 (3d Cir. 1980) ("[A] uniform pricing formula applicable to all customers is not a price discrimination under the act[,]" if the favorable "price was available, not only in theory but in fact, to all purchasers."); *Precision Printing Co.*, 993 F. Supp at 350 ("Although often referred to as a defense, [functional availability] really is not a defense at all . . . ."). Consequently, if an essential element of the plaintiff's case (i.e., discrimination in price between purchasers of like commodities) is negated by evidence showing that a pricing or discount scheme is functionally available to all participants on an equal basis, summary judgment is appropriate. If, however, proof has been made that there has been discrimination in price, then "§ 2(b) of the Act specifically imposes the burden of showing justification upon one who is shown to have discriminated in prices." *Morton Salt*, 334 U.S. at 45.

---

[9] "By statute, an otherwise illegal discriminatory payment for, or furnishing of, services or facilities is permissible if made available on proportional terms to all purchasers. 15 U.S.C. §§ 13(d), (e). Section 13(a) contains no comparable language, but the 'functional availability' [doctrine] has been judicially extended to that section." *Allied Sales and Serv. Co. v. Global Indus. Tech., Inc.*, No. Civ. A. 97-0017-CB-M, 2000 WL 726216, at *17 (S.D. Ala. May 1, 2000) (unpublished).

[10] The doctrine of functional availability is not to be confused with the issue of "functional discounts" – i.e., discounts based upon a particular marketing or distribution function, such as warehousing or delivery services, performed by the customer receiving the discount. *See Texaco, Inc.*, 496 U.S. at 571 ("A functional discount that constitutes a reasonable reimbursement for the purchaser's actual marketing functions will not violate the Act.").

From a practical standpoint, the doctrine of functional availability "is, where quantity discounts are concerned, nothing more than judicial recognition that 'cheaper by the dozen' is a too well-accepted practice of commerce to be anti-competitive in every instance." *Calumet Breweries, Inc.*, 951 F. Supp. at 753.

The doctrine of "functional availability" stems from *Morton Salt*, in which the Supreme Court deemed a volume discount program to be illegal under the circumstances because the manufacturer set the minimum purchase requirement so high that it was impossible for small buyers to obtain the discounts received by large buyers. In so holding, the Court noted that "[t]heoretically, these discounts are equally available to all, but functionally they are not." *Morton Salt*, 334 U.S. at 42.

This court has applied the functional availability doctrine in two cases in which the plaintiffs challenged volume discounts under § 13(a). In *Shreve,* the plaintiff, a farm equipment retailer, brought suit against the defendant manufacturer, alleging price discrimination due to its preclusion from the defendant's volume discount plan. 650 F.2d at 102. The defendant offered the volume discount to all of its dealers on a sliding scale – the more equipment a dealer purchased during the year, the higher the percentage of discount it received at the end of that year. The plaintiff's president, who was also its primary stockholder, voluntarily signed a contract to act as the territorial manager for the defendant and thereby received special advantages which were unavailable to other dealers. The contract also contained a condition that the acceptance of such employment would prevent the plaintiff from receiving the volume discount given to other dealers. The *Shreve* Court held that, under the circumstances, the plaintiff's president clearly understood that the plaintiff would not receive the discount. Therefore, it was not the existence of the discount program which caused the plaintiff's alleged injury, but the president's voluntary choice of an employment relationship with the defendant which caused the loss of the discount. Under such circumstances, "[t]he discount was functionally available to Shreve but it chose not to take advantage of the discount plan. Therefore, the discount plan was not the proximate cause of any alleged injury suffered by Shreve." *Id.* at 107. Accordingly, the *Shreve* Court reversed, in pertinent part, a judgment awarded to the plaintiff.

In *Bouldis*, the plaintiff, Bold-Morr, Inc., a former Suzuki motorcycle dealership, appealed a summary judgment dismissing its claims that the defendant manufacturer Suzuki's promotional programs and business policies constituted forms of price discrimination in violation of the Robinson-Patman Act. Suzuki maintained that participation in its programs was contingent upon a dealer's overall credit worthiness and presented evidence that its adverse credit decisions with respect to the plaintiff were based upon Bold-Morr's poor financial condition. The testimony of the plaintiff's officer indeed indicated that he experienced cash flow and inventory problems which, at various times, prevented him from participating in the promotional sales. In affirming the district court's order granting summary judgment, this court stated:

> The practice of conditioning price concessions and allowances upon the customer's purchase of a specific quantity of goods will not give rise to a Robinson-Patman violation if the concessions are available equally and functionally to all customers. . . . Further, a claim of price discrimination will not lie if the buyer failed to take advantage of a price concession which was realistically and functionally available. *See Shreve Equipment, Inc.*, *supra*, 650 F.2d at 105. The legislative history reveals that the aim of the Act is to prevent a large buyer from gaining discriminatory preferences over the small buyer solely because of the large buyer's greater purchasing power. *See Federal Trade Comm. v. Henry Broch & Co.*, 363 U.S. 166, 168-69 (1960); *Morton Salt Co.*, *supra*, 334 U.S. at 43[.]

> In granting summary judgment on this claim, the district court found that the various concessions and allowances made available by Suzuki's promotional programs were practically and realistically available to Bold-Morr. We agree. A review of the record demonstrates that the purchasing conditions imposed were well within the means of the average Suzuki dealer.
>
> * * *
>
> It is also important to note that the promotional packages were intended to enhance the sale of products to dealers by providing economic incentives to purchase the promoted models. Moreover, Suzuki did not expect a dealer to participate in every promotional program. It was a matter of discretion with each dealer, in the exercise of its business judgment, whether to take advantage of the promotion. Appellant Pete Bouldis testified that on some occasions he participated in the promotional programs and at other times he did not, despite the fact that he had the financial ability to do so. Bouldis testified that he had cash flow and inventory problems which prevented him, at times, from participating in the promotional sales. Accordingly, by appellant's own admission, there is no causal link between Suzuki's practices and appellant's alleged injuries. *See generally*, 16C Von Kalinkowski, [*Business Organizations*], *supra*, at § 31.01[5][c] [(1982)].
>
> Accordingly, we conclude that Suzuki's promotional programs were equally and functionally available to Bold-Morr, and, therefore, § 2(a) of the Clayton Act, as amended, was not violated.

*Bouldis*, 711 F.2d at 1326-27.

The courts of other circuits have likewise determined the viability of § 13(a) secondary-line price discrimination claims by using the functional availability doctrine. For instance, in *Sweeney,* the defendant oil company, Texaco, sold its gasoline to various wholesale distributors, including the plaintiff. When Texaco unilaterally altered the location where the plaintiff could load his delivery trucks with defendant's gasoline, causing the plaintiff to incur higher distribution costs and eliminate its locational advantage, the plaintiff filed suit, claiming that this action was tantamount to discriminatory pricing in violation of the Robinson-Patman Act. The Third Circuit Court of Appeals, citing *Morton Salt* and noting that price discounts must be available not only in theory, but in fact, to all purchasers, held that the plaintiff had failed to establish that the hauling allowance formula constituted unlawful price discrimination under § 13(a):

> In the case before us, it is the distributors, not Texaco, who determine where to place their bulk storage plants, and it is the distributors, not Texaco, who decide which retail stations they will supply. Texaco has no control over those decisions; it calculates the hauling allowance solely on the bulk plant's location in relation to the nearest pickup point. On this record, we cannot conclude that Texaco's formula forecloses any distributor from an advantageous hauling allowance. The record also fails to show that small buyers, whom the act was primarily intended to protect, are disadvantaged by the formula.

*Sweeney*, 637 F.2d at 121.

In *Krist Oil Co.,* the defendant supplied the plaintiff's retail outlets with Pepsi products. The plaintiff claimed that the defendant engaged in price discrimination because it linked its price to the retailer to the retailer's price to its customers. The plaintiff had chosen to increase its retail price on Pepsi to pay for certain capital investments, which then led the defendant to charge the retailer a higher price. In granting the defendant's motion to dismiss the Robinson-Patman allegations for

failure to state a claim, the court rejected the plaintiff's argument that the pricing structure was functionally unavailable to it, finding instead that "the lowest case price is unavailable to plaintiff not because of its disproportionately small purchasing power but because of other unrelated investments plaintiff made." *Krist Oil Co.*, 354 F. Supp. 2d at 857. The court noted that the plaintiff faced a choice that was "not an inequity imposed by the pricing structure but a fundamental economic conundrum faced by all sellers," i.e., "purchasers are left with a choice between selling more bottles at a lower per bottle profit or selling fewer bottles at a higher profit for each." *Id*. The district court added, "It is curious that plaintiff has instituted a lawsuit seeking to free itself from the shackles of lower profits." *Id*.

In *Capital Ford Truck Sales, Inc. v. Ford Motor Co.*, 819 F. Supp. 1555 (N.D. Ga. 1992), the court held that there was no violation of § 13(a) of the Robinson-Patman Act when the defendant manufacturer offered special discount incentives for trucks remaining in inventory at its plant, without applying the discount to vehicles that were in dealer stock at the time the incentives were announced, where the discounts on the manufacturer's inventory were made available to the complaining plaintiff dealership on an equal basis with other dealers, and discounts were not applied retroactively to trucks held in any other dealer's inventory. 819 F. Supp. at 1571. The court further held that the defendant's pricing system, which granted standard quantity discounts and conditioned price concessions on the number of trucks a dealer sold in a single transaction, did not give rise to price discrimination where the discounts were functionally and realistically available to all customers:

> Ford Motor avers in its motion for summary judgment that the maximum purchase quantity discounts . . . were realistically available to all dealers.
>
> Plaintiffs respond by adducing evidence which indicates that, because Capital Ford was not selling to large quantity purchasers, it did not qualify for the maximum price assistance under the [discount] program. This appears, however, to be the result of a marketing decision by Capital Ford to concentrate on sales to smaller volume customers as opposed to large fleet purchasers. Plaintiffs do not allege that Defendant in any way restricted the customers to whom Capital Ford could sell, and Plaintiffs have adduced absolutely no evidence that the purchase quantity discounts offered under the [discount] program were not realistically available to all dealers if they chose to bid larger volume buyers. *See Bouldis*, 711 F.2d at 1326; *Shreve Equipment*, 650 F.2d at 105.

*Id*. at 1578-79.

Finally, in *American Tara Corp.*, the defendant paper company, which produced a type of tissue paper used for one-time carbon paper, initiated a discount program based upon a percentage of past purchases of its product rather than a specific quantity. 1981 WL 375752 at *1. If, in 1978 or 1979, a manufacturer purchased from defendant an amount of tissue equal to 25% of the total tissue it purchased from all suppliers in 1977, that manufacturer would receive a 2.5% rebate on all of its one-time carbonizing tissue purchases from defendant during 1978 or 1979; a purchase of 26-40% of its 1977 purchase total from defendant in 1978 or 1979 would result in a percentage rebate based on a sliding scale. 1981 WL 375752 at *1. The program further provided that a manufacturer who expressed an intention to participate in the program would not be affected by price increases during the program. The plaintiff manufacturer did not qualify for the rebate and brought suit alleging price discrimination against the defendant pursuant to § 2(a), arguing that the defendant's rebate program was not functionally available to it "not because, as in *Morton Salt*, plaintiff was too small to buy the amount necessary to qualify for a rebate but because plaintiff could not buy that amount from defendant without placing itself in extreme jeopardy." *Id*. at *2. Citing *Sweeney* and

*Shreve*, the district court nonetheless upheld the pricing formula and granted summary judgment in favor of the defendant, stating:

> Although this dispute over the repercussions of choosing to participate in the program creates an issue of fact, the issue is not material and does not preclude granting summary judgment. Even if the facts were as plaintiff states, defendant did not discriminate against plaintiff. The factors which plaintiff claims made the program disadvantageous to plaintiff are not unique to plaintiff. If in 1978 plaintiff could not have bought from defendant 25% of the amount it bought from all suppliers in 1977 "without placing itself in extreme jeopardy," plaintiff's competitors could not have bought that percentage from defendant without taking the same risk. Defendant's program may have been, as plaintiff argues, a bad bargain. As long as defendant offered the same bad bargain to plaintiff as to its competitors, however, defendant did not violate the Robinson-Patman Act.

> \* \* \*

> The holdings in [*Shreve* and *Sweeney*] reflect the rationale for the functional availability defense and control our holding in this case. The plaintiffs in those cases and in this case could have qualified to receive the lower prices but chose based on their business judgment, to suffer competitive injury if their competitor's purchased at the lower price rather than assume the disabilities or risks in the commitment necessary to purchase at the lower price.

> Since plaintiff's competitors had to make the same decision, Tara's choice, not defendant's program, was responsible for the price discrimination. Therefore, the rebates which defendant gave plaintiff's competitors were functionally available to plaintiff and did not violate the Robinson-Patman Act.

*Id.* at *3.[11]

Conversely, other courts have held that, under certain circumstances, pricing mechanisms may render a quantity discount practically unavailable to the plaintiff. *See DeLong Equipment Co.*, 887 F.2d at 1516-17 (citing *Shreve* and acknowledging the functional availability doctrine, but reversing district court order granting summary judgment to defendant manufacturer where the plaintiff distributor presented substantial evidence that it was not given an opportunity to buy the "special" lower-priced item); *Allied Sales and Serv. Co.*, 2000 WL 726216 at *18 (denying summary

---

[11]*See also Metro Ford Truck Sales,* 145 F.3d at 326 (Fifth Circuit Court of Appeals held that wholesale discount program, offered by the defendant manufacturer to all of its authorized truck dealers to help with bidding for large volume purchasers, did not constitute unlawful price discrimination because program was in fact, and not merely theoretically, available to all dealers and the plaintiff conceded that the discounts were available to it on an equal basis with other Ford dealers); *Comcoa, Inc.,* 931 F.2d at 664 (Tenth Circuit Court of Appeals held that availability "defense" applied to special volume discounts offered on technologically obsolescent equipment; court approved jury instruction that stated for the availability doctrine to apply, "the implementation of a discount program need not guarantee that all customers benefit to the same degree as other customers, as long as the program is evenly administered"); *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 929 (9th Cir. 1980) (summary judgment proper where it was undisputed that defendant manufacturer made contested discounts "equally available to any qualified purchaser in any market"); *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1024-25 (2d Cir. 1976) ("[W]hile the incentive payment plan did not set a single uniform price for all types of sales made by Ford to its dealers, it was administered with an even hand, without any discrimination among the dealers who purchased from Ford."); *Rod Baxter Imports, Inc. v. Saab-Scania of America, Inc.,* 489 F. Supp. 245, 247 (D. Minn. 1980) (no price discrimination occurred where bonus payments under Sell-a-Bration sales incentive program were "available on a reasonably equivalent basis to all dealers who made the commitment to obtain them" and the failure of some dealers to reach their quotas was the result of factors other than program, such as low inventory, poor financing, reduced sales forces, and poor management).

judgment to the defendant where issues of fact existed as to whether the challenged repair discount was functionally available to the plaintiff, i.e., what the criteria for discount actually were and whether the plaintiff knew about the discount); *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 752 (1st Cir. 1994) (reversing district court's order dismissing complaint for failure to state a claim where allegations that the plaintiff retailer did not know that its competitors were receiving favored treatment from the defendant manufacturer were sufficient to establish that favored treatment was not functionally available:  "[W]e do not see how ordinarily one could say that a seller has made favored treatment 'available' to a disfavored customer if the disfavored customer *does not know* about the favored treatment."); *Calumet Breweries, Inc.*, 951 F. Supp. at 754-55 (in the context of granting a preliminary injunction, concluding that there was ample evidence that volume discount was only theoretically, but not functionally, available to the plaintiff because retroactive quantity adjustments in effect resulted in a secret discount that only the favored wholesaler could obtain, and the defendant handicapped the plaintiff by limiting the array of product choices available to it and by imposing restrictive inventory requirements); *Nat'l Dairy Prod. Corp. v. FTC*, 395 F.2d 517, 523 (7th Cir. 1968) (affirming Federal Trade Commission order requiring dairy distributor to cease unlawful price practices where evidence showed that discriminatory quantity discounts favoring chain store customers and "[w]e also cannot accept National's argument that the disfavored independents should have joined voluntary or cooperative groups and thus obtained higher discounts.").

As reflected in the above cases, the functional availability doctrine has been applied historically in the context of quantity discounts, yet its underlying rationale – that a discount equally and realistically available to all purchasers of a like commodity does not constitute discrimination in price within the meaning of § 13(a) – is no less relevant in judging the legality of market-share discount formulas such as the WPP.

The doctrine seemingly defies the logic that a rational purchaser of goods will always seek to obtain the best discount or concession that is available to it; if a higher discount is realistically and practically available, why would a reasonable purchaser *not* take advantage of the best possible price?  However, the functional availability doctrine reflects the realities of the marketplace and recognizes that purchasers in competitive markets, particularly multi-brand distributors or wholesalers, must make difficult economic choices, prioritize brand sales and often decline conditional discounts for reasons unrelated to their actual ability to obtain them.  Thus, as reflected in the above cases, the courts have refused to find price discrimination under § 13(a) when the purchaser's decision or capacity to take advantage of the best discount made "available on a reasonably equivalent basis to all dealers who made the commitment to obtain them," *Rod Baxter Imports, Inc.*, 489 F. Supp. at 249, was determined by elements within its control – i.e., unrelated investments (*Krist*); poor credit ratings (*Bouldis*); management issues, inventory decisions, or marketing strategies (i.e., *Shreve*, *Capital Ford* and *Sweeney*); or a decision to promote the competitor's product (*Amer. Tara Corp.*) – and not by disproportionately small purchasing power or the pricing structure itself.

The doctrine also underscores the fact that the Robinson-Patman Act neither ensures success nor excuses purchasers from making difficult decisions about which competing brands to carry, market, or promote:

> In any competitive economy we cannot avoid injury to some of the competitors.  The law does not, and under the free enterprise system it cannot, guarantee businessmen against loss.  That businessmen lose money or even go bankrupt does not necessarily mean that competition has been injured.  H.R. Rep. No. 1422, 81st Cong., 1st  Sess. 5-6.

*Sun Oil Co.*, 371 U.S. at 519.[12]

Here, the district court, acknowledging this court's *Bouldis* and *Shreve* decisions, applied the functional availability doctrine to the present circumstances, concluding that summary judgment in favor of RJR was warranted because the undisputed evidence demonstrated that the WPP program was nondiscriminatory, evenly administered, and therefore functionally available on an equal basis to all of RJR's direct distributors. Plaintiffs dispute this conclusion.[13]

IV.

A.

Despite the fact that the SOS formula of the WPP is uniformly applied to all of RJR's wholesale distributors, plaintiffs nonetheless maintain that the WPP results in price discrimination

---

[12]Plaintiffs cite the *Caribe*, *Calumet Breweries*, and *National Dairy* decisions for the proposition that, pursuant to § 13(a), a seller cannot legally condition price concessions on self-damaging sacrifices by a buyer, particularly where sacrifices of equal magnitude would not be required of the buyer's more favored competitors. However, we find these cases to be inapposite to the present circumstances. All of these cases involved inherently suspect volume discounts which permitted large buyers to secure a competitive advantage over a small buyer because of the large buyer's quantity purchasing ability. In *Caribe*, allegations that the plaintiff retailer did not know that its competitors were receiving favored treatment from the defendant manufacturer were sufficient to establish that the favored treatment was unavailable to the retailer so as to allow a claim to proceed under § 13(a). Contrary to the present plaintiffs' assertion, the case did not turn upon the plaintiff's argument that it should not be required to give up various advantages of its importer's contract. Rather, the *Caribe* court specifically declined to endorse that argument and made clear that "if a seller makes its favorable prices and terms available to an otherwise disfavored customer, that customer has no legal right to complain." 19 F.3d at 751.

The present case bears little resemblance to *Calumet Breweries, Inc.*, a case of "blatantly discriminatory" favoritism, where the defendant supplier structured its volume discount program to specifically favor its largest customer, by effectively granting a secret discount, imposing inventory restrictions, and limiting the array of products available to the disfavored customer. 951 F. Supp. at 754. Noting that, pursuant to *Morton Salt*, an inference of competitive injury arises from any quantity discount, the court stated, "[n]othing in the Robinson-Patman Act or the cases interpreting it suggests that [the disfavored purchaser's] decision to emphasize other brands and remain a (relatively) small seller of [the defendant's] products *ipso facto* means [the defendant] may charge [the disfavored purchaser] a higher price." *Id.* at 755. As noted by Barbara O. Bruckman in *Discounts, Discrimination, and Exclusive Dealing: Issues Under the Robinson-Patman Act*, 68 Antitrust L.J. 253, 270 (2000), *Calumet* "should not be read to weaken the general principle that if a customer can take advantage of a discount but chooses for its own reasons not to do so, the seller is not later liable under Section 2(a) for losses that the customer may suffer by virtue of that choice."

Finally, in *National Dairy,* the Seventh Circuit Court of Appeals held that an order of the Federal Trade Commission requiring a dairy product distributor using volume discount schedules in various states to cease unlawful price practices was not an abuse of discretion, noting that "[w]e also cannot accept National's argument that the disfavored independents should have joined voluntary or cooperative groups and thus obtained higher discounts. The Robinson-Patman Act does not force them to sacrifice their independence." 395 F.2d at 523. The present case, unlike *National Dairy*, neither involves a volume discount nor avers that plaintiffs must join forces and sacrifice their independence in order to protect themselves from large distributors.

In sum, none of these cases support plaintiffs' assertion that § 13(a) does not require them to change their business structure, reconfigure their customer base, or undertake an expensive and risky business plan. To the contrary, a discount program may be functionally available even when the choice "would have threatened [the plaintiff's] very existence," *Amer. Tara,* 1981 WL 375752 at *2, or when the choice "would not be economically possible." *The Iams Co. Litigation*, No. C-3-90-014, 1992 WL 1258514, at *2 (S.D. Ohio July 24, 1992) (unpublished).

[13]To the extent plaintiffs argue that the district court's order granting summary judgment in favor of defendant is improper because it is inconsistent with the court's earlier preliminary injunction ruling, this argument is without merit. It is well established that "[t]he purpose of a preliminary injunction is simply to preserve the status quo; thus, findings of fact and conclusions of law made by a district court in granting a preliminary injunction are not binding at a trial on the merits." *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004).

because the share targets are grossly inflated, arbitrary, unrealistic, and impossible for plaintiffs to meet. Plaintiffs broadly claim that they are pawns in RJR's battle against fourth-tier cigarette manufacturers and that RJR, rather than compete lawfully against its fourth-tier competition by lowering prices on certain of its cigarette brands, adopted the WPP in 2000 to foreclose distributors from selling fourth-tier brands altogether to their retail customers. Such sweeping complaints about the cigarette industry are, however, not the appropriate focus of this secondary-line price discrimination suit.

More to the point, plaintiffs allege that the WPP disfavors them because, unlike RJR's other distributors, they operate largely in rural "low-end" segments of the market where their retail customers demand fourth-tier brands, and RJR does not price any of its brands at the fourth-tier price level. The gravamen of plaintiffs' price discrimination claim is set forth in ¶¶ 26-28 of their Fifth Amended Complaint, in which plaintiffs aver:

26.

In August 2000, in response to competition from lower-priced 4th tier cigarette manufacturers, RJR dramatically changed the discount pricing structure of its products for its distributors by implementing the WPP. The WPP set up three separate price tiers for distributors, Levels 1, 2, and 3. Under the WPP, if a distributor's sales of RJR "value priced" brands, as compared with its sales of 4th tier brands and the value priced brands of other manufacturers, do not meet a pre-determined goal in terms of RJR market share of sales, the pricing structure penalizes such distributors on their net (discounted) price. RJR does not price any of its cigarettes at the 4th tier level. This scheme by RJR is aimed at coercing distributors to limit sales of 4th tier brands and other competitors' brands, and designed to force sales of RJR products at higher prices. In implementing the WPP, RJR set the standard for the best discount and back-end monies at such an extreme level that for an overwhelming majority of distributors, including Plaintiffs, the WPP's best price could never be achieved.

27.

RJR's products are indispensable to Plaintiffs' wholesaler business because their customers (i.e., retail stores) demand that the wholesaler carry a full range of tobacco products so that they can buy all manufacturers' cigarettes from one wholesaler. However, because Plaintiffs service retailers who sell to poorer consumers, they must offer cheaper 4th tier cigarettes to compete as a distributor. This has resulted in [the] inability to obtain the WPP's best price from RJR. Plaintiffs are forced to compete directly against distributors receiving substantially better prices and whose markets overlap with various portions of Plaintiffs' markets. Critically, Plaintiffs have no significant control over consumer demand, and cannot reduce their sales of 4th tier cigarettes, or other RJR competitors' products, without losing retailer customers. Given Plaintiffs' customers and market for sales, the best price under RJR's WPP is impossible for them to achieve.

28.

Through the WPP, RJR penalizes distributors, including Plaintiffs, who sell 4th tier and other RJR competitors' cigarettes, by reducing allowed discounts and back-end monies as a means of preventing them from distributing cigarettes of RJR's competitors. As a result, Plaintiffs must pay substantially more than their own

competitors for the same RJR products, which places Plaintiffs at a severe competitive disadvantage and has resulted in substantial competitive injury.

The WPP's pricing formula thus purportedly places plaintiffs in a no-win situation – either accede to RJR and destroy their business or meet customer demands and attempt to absorb RJR's discriminatory price differences while suffering debilitating lost profits. Plaintiffs contend that the alleged price disadvantage instigated by the WPP "has caused Plaintiffs to experience millions of dollars in lost profits," and has "caused a loss of customers and threatened the viability of Plaintiffs' businesses." (Complaint, ¶ 29). According to plaintiffs, the "very existence" of the allegedly favored competitors is not similarly threatened because these competitors have a pre-existing "higher-end" customer base that does not demand fourth-tier cigarettes, thus allowing the competitors to qualify for the WPP's best prices.

In response, defendant contends that its best price is as functionally available to each plaintiff as it is to any of that plaintiff's competitors and the relative size of the competitors is irrelevant because all are treated the same in a market-share-based program. Defendant posits that plaintiffs have a choice, albeit difficult: either they can attempt to attain defendant's marketing goals by curtailing their sales of fourth-tier cigarettes or they can continue to promote fourth-tier cigarettes and receive a lower discount on defendant's products.

Plaintiffs counter that this purported "choice" is unpalatable – because most retailers prefer to buy their stock from a single distributor, if plaintiffs curtail the sale of fourth-tier cigarettes, their customers will take their entire business elsewhere. Thus, dropping competitor products from inventory would result in an immediate loss of customers because they operate as full-line, full-service distributors. Plaintiffs maintain that "§ 2(a) does not require buyers to attempt . . . to drastically change their business structure and radically reconfigure their customer base in order to avoid price discrimination, particularly when such an expensive and risky business plan would lead at best to massive losses."

Plaintiffs further assert that genuine issues of material fact exist regarding whether the WPP's best discounts were functionally available to them, first arguing that in granting summary judgment, the district court erroneously concluded that plaintiffs' "inability to take advantage of the best discount" was because of "an outside influence, not in the control of RJR . . . ." Plaintiffs maintain that in so holding, the district court failed to recognize that the WPP's principal mechanism of discrimination – grossly inflated share targets – is solely within RJR's control.[14]

In this regard, plaintiffs presented evidence allegedly showing that in the first quarter of 2003, the WPP's Level 2H share target in states where plaintiffs conduct their business exceeded RJR's alleged state savings brands market share in such states and that RJR's market-share figures used for the WPP calculations were inflated above RJR's actual state market share. The Level 2H target was, according to plaintiffs, as much as 22.5 points higher than RJR's actual market share in the pertinent areas. Plaintiffs allege that RJR's representation that the WPP share target was set around 30% below RJR's actual savings brands state share is deceptive, because the particular target used as the basis for this computation is the Level 2A target, the second worst of ten price levels, and thus it would not entitle a distributor to RJR's best discounts.

---

[14]Plaintiffs also suggest that the district court's pronouncement in this regard fails as a matter of law to the extent it suggests that factors outside of the seller's (RJR's) control, such as consumer demand, are irrelevant to the functional availability issue. Otherwise stated, although plaintiffs agree that certain circumstances solely within the buyer's control, such as poor credit, *see Bouldis*, 711 F.2d at 1325, cannot render a program functionally unavailable, *any circumstances not within the buyer's control* are relevant to a determination whether the qualifications for the best price can be met as a functional or practical matter. Plaintiffs maintain that none of the circumstances making the WPP's best prices functionally unavailable in the instant matter are within plaintiffs' control.

Plaintiffs' economic expert opined that RJR's best prices were not practically available to most distributors, including all plaintiffs. Nine of the original plaintiffs competed against Level 2H distributors, ten plaintiffs competed against Level 2G distributors, and one plaintiff competed against Level 2F distributors. From the second quarter 2002 through the third quarter 2003, only 7 - 8% of RJR's 700 direct distributors reached their Level 2H targets under the WPP. During this same time period, only an additional 4% of RJR distributors achieved Level 2G or higher, and only an additional 6.5% of RJR distributors reached Level 2F or higher. Most distributors failed to reach even Level 2C or higher. Plaintiffs claim that this inability of over 90% of RJR wholesalers to achieve the WPP's best price applies throughout the complaint period. Consequently, plaintiffs maintain that a share target set well in excess of RJR's actual market share is not "well within the means of the average" distributor, *Bouldis,* 711 F.2d at 1326, and also favors those competitor distributors with a pre-existing customer base that already purchase a greater share of RJR products.

Plaintiffs further allege that there are serious flaws in the methodology used by RJR to compute its share targets. Plaintiffs complain that the data does not accurately capture non-reporting members, cash and carry purchases, or sales volume in certain counties within a state.[15] The mean per capita income provided by RJR is allegedly of little probative value because it masks relevant information about variations in income between different areas of a given county and does not account for the presence of nationwide convenience store chains in those areas (selling a higher percentage of RJR's second-tier Doral brand and other expensive products) and smaller, independent and rural retailers (selling a higher percentage of discount cigarettes to primarily local consumers).

Finally, plaintiffs produced evidence in the form of letters and testimony that when they attempted to qualify for RJR's best price, they suffered a substantial decline in the financial welfare of their businesses.

In sum, according to plaintiffs, the record evidence indicates that: (1) distributors cannot measurably increase the demand for RJR products; (2) plaintiffs do everything they can to sell as many RJR products as possible; (3) RJR's own data shows that the WPP's best price is practically achievable by only 8% of all distributors; and (4) plaintiffs and their most favored competitors did not face the same bad business choice in attempting to qualify for the WPP's best price. Plaintiffs argue that each of these genuine issues of material fact on the functional availability issue warrants reversal of the district court's order granting summary judgment to defendant.

## B.

As previously noted, a secondary-line price discrimination claim brought under § 13(a) of the Robinson-Patman Act requires proof that the defendant discriminated in price between different purchasers of commodities of like grade and quality, in interstate sales, and the effect of that discrimination was to substantially lessen competition or tend to create a monopoly in any line of commerce. *Volvo Trucks,* 126 S. Ct. at 870. The parties do not dispute that the relevant sales were made in interstate commerce and that the commodities were of like grade and quality.

Accepting as true plaintiffs' allegations in the context of this summary judgment review, we nonetheless conclude that summary judgment is warranted because the undisputed material facts

---

[15]Specifically, plaintiffs assert as follows:

Perhaps even more glaring a deficiency in RJR's experts' per capita income comparison is the binary classification of each county within a state as either "served" or "unserved." RJR's methodology fatally makes no provision for sales volume (in units or dollars) in any "served" county. A county in which a Plaintiff sells 10 cartons of cigarettes per month was given equal weight to one in which that same Plaintiff sold 10,000 cartons per month. This analysis made no effort to accurately reflect concentrations in Plaintiffs' business.

demonstrate that RJR's best discount under the WPP was functionally available to plaintiffs on an equal basis, thus affirmatively disproving the element of discrimination in price.

We initially note that the WPP does not bear any of the obvious hallmarks of a discriminatory pricing program. RJR developed a share-based program, not a quantity-based program of the sort condemned by the Supreme Court in *Morton Salt*. Plaintiffs do not claim that they are too small to take advantage of the discount[16] or allege that they, unlike other wholesalers, were ignorant of its terms or deprived of access to the WPP. Further, there is no evidence that RJR manipulated the WPP to favor certain wholesalers. To the contrary, the evidence shows that RJR has evenhandedly applied the WPP, treating all of its wholesalers equally and offering all of them the same qualification terms. Each wholesaler performed equivalent functions to obtain the discounts.

To determine the share-of-savings targets, RJR first calculated an overall state target by ranking all of its wholesalers in the state, starting with the wholesaler with the highest RJR savings share (which, as RJR points out, was not necessarily the wholesaler with the highest volume) and ending with the wholesaler with the lowest RJR savings share. RJR then selected as the state target the RJR savings percentage of the wholesaler whose volume, when added to the volume of the wholesalers with higher savings brands shares, accounted for approximately 85% of RJR's wholesale volume in the state. RJR then calculated a share-of-savings target for each wholesaler, using the previously calculated state targets and weighting them to reflect the percentage of the wholesaler's business in different states. Because participation in the program did not depend on the volume of a wholesaler's RJR sales, small wholesalers were treated the same as large wholesalers.

Reiterating plaintiffs' core argument that RJR's best share-of-savings targets were unattainable (1) because they serviced retailers who sold to poorer customers, (2) resulting in a uniquely high demand for fourth-tier cigarettes, plaintiffs have proffered neither statistical evidence nor expert testimony to support these allegations. No plaintiff presented evidence both (1) that it sold only in lower-income areas in the states within its service area and (2) that the demand for fourth-tier cigarettes was higher in its sales area than in other areas of the state.

RJR, on the other hand, presented comparisons of the average per capita income in the counties served by each plaintiff to the average per capita income in the remaining counties in the states in which the plaintiff sold. This evidence, in the form of U.S. Department of Commerce data on county income levels, showed that the average per capita income in the served counties exceeded that of the counties not served for most plaintiffs. Only three of the original plaintiffs (Smith, Rice, and Pelican) sold in counties that had statistically lower average income levels than the remaining counties in the states in which they sold. Two of the plaintiffs (Rice and Smith) sold in virtually the same areas as another allegedly favored wholesaler, Virginia Wholesale, that earned discounts at an upper level of the WPP. Another plaintiff, Pelican, admitted that higher-income areas existed within its own sales area. In sum, the data showed that plaintiffs sell in a range of counties, from some that have relatively low incomes to others that have relatively high incomes.

Plaintiffs' expert conducted no analysis of this issue and admitted that he did not plan to offer an opinion on whether plaintiffs sold in lower-income areas. He did not factor income levels

---

[16]Although not alleged in their complaint, plaintiffs broadly argue that WPP favors the largest distributors – "[T]he fact that 85% of RJR's volume may have qualified for Level 2 "A" pricing did not translate into 85% of RJR's distributors qualifying for that price. The 21 largest distributors (of around 700 direct accounts) control 50% of RJR's sales volume and are at the WPP's highest program levels." This vague assertion is insufficient to support a claim that the WPP favors larger distributors by virtue of their greater purchasing power.

into a computation of lost profits. Two plaintiffs (A.B. Coker and Yakima) conceded that their sales areas included entire states, not merely low-income pockets in those states. Other plaintiffs[17] conceded that they served higher-income portions of their sales areas or that higher-income areas existed in their sales areas. Some plaintiffs conceded that they had no evidence that they served lower-income areas or that their perception that they served lower-income areas was simply conjecture.[18]

Further, because plaintiffs failed to substantiate, with comparative data, differences in fourth-tier demand between the areas of states where they sell and those states as a whole, plaintiffs have thus failed to show that actual demand for fourth-tier cigarettes was, in fact, higher in their sales areas. Again, plaintiffs' expert did not address this issue. Moreover, plaintiffs presented no evidence that RJR's share in areas where plaintiffs sold was any different than RJR's statewide shares in the states where the allegedly less-affluent areas were located. In sum, plaintiffs are unable to verify the grounds for their price discrimination claim – that they predominantly service retailers who sell to poorer customers, resulting in a uniquely high demand for fourth-tier cigarettes – in turn foreclosing proofs that the WPP actually disfavored plaintiffs on the basis of these characteristics.

In any event, there is no evidence that anything other than plaintiffs' marketing decisions impacted their ability to obtain the WPP's best prices. The undisputed evidence demonstrates that plaintiffs faced a choice that was "not an inequity imposed by the pricing structure but a fundamental economic conundrum faced by all sellers." *Krist Oil Co.*, 354 F. Supp. at 857. Plaintiffs could alter their sales mix at any time so as to qualify for the varying discount levels.

Plaintiffs complain that only a small percentage of wholesalers actually reached Level 2H. However, this is a neutral fact, not a material issue, which simply reflects the outcome of different choices made by different wholesalers. The legality of RJR's incentive program does not turn on whether, in fact, each wholesaler actually achieved the highest level in the WPP program. The very nature of an incentive program necessarily leads to different outcomes based on performance. *See, e.g. Comcoa*, 931 F.2d at 664; *Sweeney*, 637 F.2d at 121-22. As long as defendant offered the same best price to plaintiffs as to their competitors, using a nondiscriminatory pricing formula, defendant did not violate the Robinson-Patman Act.

Finally, with regard to plaintiffs' allegations of inflated shares, plaintiffs' proofs are lacking in a demonstration or appropriate comparison regarding how any discrepancy between actual and reported market share affected plaintiffs more than other supposedly favored wholesalers. Moreover, importantly, plaintiffs have failed to demonstrate how this allegedly improper calculation detrimentally affected competition. In essence, plaintiffs suggest that RJR did not have to set its discount levels in the particular manner set in the WPP: "RJR could set share targets that are reasonably related to each distributor's past sales and market share. This design, contrary to RJR's WPP, would treat all distributors equally at the outset because targets would be set according to the cigarette demands of each distributor's actual market and available customer base." However, we will not entertain plaintiffs' invitation to re-engineer the uniformly applied WPP incentive program to make it more reasonable for some participants. *See Sweeney*, 637 F.2d at 121-22 (declining to impose a "station by station" formula "[g]iven the evenhanded application of the formula" and the "substantial administrative burden" on the defendant); *Rod Baxter Imports, Inc.*, 489 F. Supp. at 249 ("The evidence presented by plaintiff tending to indicate that some dealers would have been better or worse off if a longer base period was used, does not in the court's view establish that the program

---

[17]Plaintiffs A.B. Coker, Andalusia, Caldwell, Church Point, Huntsville, Independent, Bates, Shanks, Pelican, Taylor, Reidsville, and Yakima.

[18]Plaintiffs Affiliated, Dixie, George, Shanks, McCarty-Hull, Pelican, Rice, and Topicz.

was unfair or that it may have had the effect of substantially limiting competition."). As the magistrate judge noted in his Report and Recommendation in the instant case:

> [T]he Court disagrees with the plaintiffs that defendant's decision to set the target goals on a statewide basis was arbitrary and improper. To be sure, there are two "arbitrary" factors in defendant's calculation. Using a state to set its targets, as opposed to some other geographical or demographical area, was arbitrary, but no other geographical area would have been any less arbitrary. And using eight-five percent as the baseline target also could be said to be arbitrary, since defendant could have chosen ninety percent, or seventy-five percent, or any other percentage. But picking a number fifteen percent *below* defendant's market share in a given state was not unreasonable. Plaintiffs essentially argue that defendant should have set the targets on a per-distributor basis which, of course, would be tantamount to having no market-share-based incentive program at all. These targets treat all distributors equally; each has the same opportunity to achieve higher discount levels. From the fact that unpleasant, even draconian, business decisions might be required, it does not follow that the discount scheme is *discriminatory*.
>
> Admittedly, the "reasonableness of choice" issue is troublesome. . . . But if the reasonableness or unreasonableness of business decisions is a factor that must be considered with respect to functional availability of a market-share-based discount program, then such a discount program always will be as inherently suspect as a volume-based discount program. Any given distributor could claim that it could not meet a market-share goal because it would be required to alter its business in some fashion which the distributor subjectively determines to be unreasonable. No seller could ever know if its program was lawful under Robinson-Patman; the legality of any market-share-based discount program only could be ascertained with respect to each and every buyer after a jury decides whether the business decisions forced upon that buyer were reasonable or not. Although plaintiffs argue they are not challenging market-share-based discount programs *per se*, in reality they are, simply because any distributor could challenge the target goal as unreasonable *as to it*; and if that distributor prevails, the entire discount program would collapse as unworkable. The result would be "tailor-made" discounts which themselves presumptively violate the Robinson-Patman Act.
>
> * * *
>
> Defendant's program is designed to promote its financial welfare at the expense of that of the wholesalers. Perhaps it is unfair, but it is not illegal.

The Robinson-Patman Act proscribes price discrimination only to the extent that it threatens to injure competition, and, in the absence of such a showing, we will not intercede so as to micromanage the distribution system of defendant. As the Supreme Court noted in *Volvo Trucks,* the Robinson-Patman Act does not bar a manufacturer from restructuring its distribution system to refine productivity:

> The dissent assails Volvo's decision to reduce the number of its dealers. . . . But Robinson-Patman does not bar a manufacturer from restructuring its distribution networks to improve the efficiency of its operations. If Volvo did not honor its obligations to Reeder as its franchisee, "any remedy . . . lies in state laws addressing unfair competition and the rights of franchisees, not in the Robinson-Patman Act." Brief for United States as *Amicus Curiae* 28.

*Volvo Trucks*, 126 S. Ct. at 873 n.4.

C.

Under the circumstances, we affirm the district court's order granting summary judgment in favor of defendant. As the district court properly found, the WPP's market-share discount was offered to all wholesalers using a non-discriminatory formula. It was therefore functionally available to plaintiffs not only in theory, but in fact. The capacity of plaintiffs to qualify for the WPP's best discount was a matter of marketing strategy and brand prioritization, a choice inherent and unavoidable in multi-brand incentive programs. Because the WPP discount was functionally available to plaintiffs, a requisite element of a prima facie secondary-line price § 13(a) claim, price discrimination has not been established, and plaintiffs' claim therefore fails as a matter of law.

Application of the WPP program may ultimately cull the number of RJR's distributors. However, the functional availability doctrine does not require a supplier to ensure the success of its customers. Whether this potential loss of participating wholesalers will ultimately benefit *defendant* remains to be seen.

Affirmed.